IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOHN RODRIGUES, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 18-00027 ACK-RLP |
| | ) |
| COUNTY OF HAWAII; SAMUEL JELSMA, | ) |
| individually, DOE PERSONS 1-10; | ) |
| DOE PARTNERSHIPS 1-10; DOE | ) |
| CORPORATIONS 1-10; ROE | ) |
| "NON-PROFIT" CORPORATIONS 1-10; | ) |
| AND ROE GOVERNMENTAL | ) |
| ENTITIES 1-10, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER GRANTING DEFENDANTS COUNTY OF HAWAII AND SAMUEL JELSMA'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

For the reasons detailed below, the Court GRANTS Defendants' Motion to Dismiss the First Amended Complaint, ECF No. 17, and dismisses all of Plaintiff's claims without prejudice.

### FACTUAL BACKGROUND

According to the First Amended Complaint ("FAC"), ECF No. 16, Plaintiff John Rodrigues, Jr. ("Plaintiff") is a retired police officer who retired on August 31, 2016, after serving with the Hawai`i County Police Department ("HCPD") for twenty-six years, FAC ¶ 10. At all relevant times, Plaintiff was a "qualified retired law enforcement officer" as that term is defined under 18 U.S.C. § 926C (the "Law Enforcement Officers

Safety Act" or "LEOSA"). Id. ¶ 96. Plaintiff had met standards for qualification in firearms training for active law enforcement officers with the HCPD, including for his Remington shotgun and 9mm Smith & Wesson handgun; these qualifications expired on December 24, 2016. Id. ¶ 89.[1]

On or about January 26, 2017, at 10 a.m., Plaintiff called 911 to request police assistance after he was threatened by an individual known to him as Wesley "Mana" Brooks. Id. ¶¶ 11–12. Witnesses informed HCPD officers that Brooks had brandished what appeared to be a chrome-plated, 9mm handgun, chambered a round, pointed the handgun at Plaintiff, and fired a round at him. Id. ¶ 13. At no point did Plaintiff take out, brandish, or display any firearms, or point any firearms in Brooks's direction. Id. ¶ 14.

One of the responding officers was Defendant Samuel Jelsma ("Defendant Jelsma"), a captain in the HCPD. Id. ¶ 15. Plaintiff and Defendant Jelsma were acquainted, and Defendant

---

[1] Plaintiff asserts in his Opposition, and attaches thereto an exhibit purporting to show, that in fact his qualifications for the at-issue firearms were valid on January 26, 2017. See Opp. at 22; id. at Ex. 10, ECF No. 24-2 at 1–2. For the purposes of the instant Motion, of course, this allegation is irrelevant. "In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss. . . . The focus of any Rule 12(b)(6) dismissal—both in the trial court and on appeal—is the complaint." Schneider v. Calif. Dept. of Corr., 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (emphasis in original) (citations omitted).

Jelsma had and has a personal grudge against Plaintiff. Id. ¶ 65. This grudge stems from a number of incidents, but first arose in the 1990s, when the two were roommates during a two-week specialized Traffic Enforcement Unit training in Honolulu. Id. ¶¶ 65, 65(a). There, Defendant Jelsma deliberately irritated and mocked Plaintiff about the course material, studying, and preparing for the training's final exam. Id. ¶ 65(b).

Later, after Defendant Jelsma's promotion to sergeant, Plaintiff was assigned to assist him in a DUI enforcement roadblock. Id. ¶ 65(c). Defendant Jelsma instructed Plaintiff to perform an activity that Plaintiff believed to be inefficient, and did not appreciate it when Plaintiff expressed that opinion. Id.

In approximately 2010 or 2011, Plaintiff was once again assigned to assist Defendant Jelsma, this time in locating and arresting a dangerous fugitive. Id. ¶ 65(e). When the fugitive was cornered, Defendant Jelsma, in the presence of other law enforcement officers, repeatedly refused to go in and make the arrest. Id. Plaintiff proceeded to make the arrest without incident, after which point Defendant Jelsma was hostile toward Plaintiff due to a perceived slight to Defendant Jelsma's reputation. Id.

Most recently, prior to Plaintiff's retirement, Plaintiff and another officer spotted a fugitive driving a stolen truck; upon seeing Plaintiff, the fugitive sped away, driving well over the speed limit. Id. ¶ 65(f). Plaintiff contacted the Pahoa HCPD station (of which Defendant Jelsma was the captain) over the police radio to inform them that a fugitive was driving a stolen truck in their direction. Id. Plaintiff was not in pursuit of the fugitive, but Defendant Jelsma contacted Plaintiff over the police radio and ordered him to come to the Pahoa station to type out a memo or report concerning his pursuit of the fugitive. Id. Plaintiff, thinking this was odd, contacted his supervisor, who overrode Defendant Jelsma's order and informed Defendant Jelsma over the police radio that Plaintiff would not be typing out a memo or report. Id. This embarrassed Defendant Jelsma. Id.

Based on these incidents, and on comments from coworkers, Plaintiff believes that Defendant Jelsma would use any and every opportunity to embarrass, humiliate, or discipline him. Id. ¶ 65(g).

When HCPD officers arrived at the scene on January 26, 2017, Defendant Jelsma approached Plaintiff and asked if he had any firearms in his vehicle. Id. ¶ 15. Plaintiff responded in the affirmative, id. ¶ 16, at which point Defendant Jelsma said,

"We need a consent from you to enter your vehicle," id. ¶ 17.

Plaintiff gave his consent.  Id. ¶ 18.

Before the search commenced, Plaintiff took out a photographic identification card issued to him by HPCD, which identified Plaintiff as a retired detective from HCPD, id. ¶ 19, and which read, on the back, as follows:

> This card is for identification purposes only, pursuant to 18 United States Code [§] 926C(d), Carrying of Concealed Firearms By Qualified Retired Law Enforcement Officers. This identification DOES NOT perm[i]t the holder to carry a concealed firearm pursuant to 18 United States Code [§] 926C and in [and] of itself is not inte[n]ded to comply with or be applicable to State statutes and administrative rules governing identification for the purpose of carrying a concealed and/or unconcealed firearm.

FAC, Declaration of John Rodrigues, Jr. ("Rodrigues Decl."), ECF No. 16-10 ¶ 13; FAC Ex. 2 ("ID Card"), ECF No. 16-2 at 1-2.[2] Plaintiff attempted to hand the identification card to Defendant Jelsma, and told Defendant Jelsma (in the presence of other HCPD officers) that he was permitted to carry concealed firearms under LEOSA, but Defendant Jelsma ignored Plaintiff's statements and refused to look at the ID Card.  FAC ¶¶ 20-22.

---

[2] A court resolving a motion to dismiss may consider three types of materials, other than the complaint itself, without converting the motion to a summary judgment motion: documents attached to the complaint, documents incorporated by reference into the complaint, and matters that are properly the subject of judicial notice.  See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).  Here, Plaintiff attached a number of documents to the FAC, including the ID Card.

Plaintiff then related to Defendant Jelsma the history between Plaintiff's family and Brooks. Id. ¶¶ 23-30. Among other incidents, Brooks had previously made death threats against Plaintiff's son while brandishing an AK-47 assault rifle and a chrome-plated 9 mm handgun. Id. ¶ 23-24. Brooks had also stalked the Plaintiff's son at his workplace and had threatened his life in front of others. Id. ¶ 25. Plaintiff's son reported each incident to the HCPD, which had taken no action against Brooks and had not investigated any of the claims made by Plaintiff's son. Id. ¶ 26. Plaintiff told Defendant Jelsma that Brooks's threats and actions were escalating dangerously, and that Plaintiff wanted to protect his son's life and ensure that HCPD detained and investigated Brooks, id. ¶ 28-29, but that Plaintiff was concerned that HCPD was doing nothing. Id. ¶ 30. Defendant Jelsma responded that Plaintiff should have called HCPD and spoken to a supervisor. Id. ¶ 31. When Plaintiff expressed concern that Brooks would act on his threats, and asked why HCPD was not taking action, Defendant Jelsma ignored him. Id. ¶ 32.

HCPD officers then searched Plaintiff's vehicle, and recovered a Remington shotgun and a 9mm Smith and Wesson handgun, id. ¶ 33, both of which were legally registered to Plaintiff, id. ¶¶ 38-39. The Remington shotgun was on the floor of Plaintiff's truck, in the back of the cab, id. ¶ 34, and the

9mm Smith and Wesson handgun was in a holster on the floor
beneath the driver's seat, id. ¶ 35.  During the search,
Plaintiff displayed the ID Card and told the HCPD officers he
was allowed to carry concealed firearms, id. ¶ 36, but Defendant
Jelsma ordered the officers to continue the search, id. ¶ 37.
Plaintiff then again asked Defendant Jelsma if he intended to do
anything about Brooks and the threats against Plaintiff's son,
but Jelsma continued to ignore Plaintiff.  Id. ¶ 40.

At approximately 11:02 a.m., Defendant Jelsma
instructed Plaintiff to drive himself to the Pahoa police
station, where later he would be free to go.  Id. ¶ 41.
Plaintiff was not under arrest.  Id. ¶ 42.  Plaintiff drove
directly to the Pahoa police station, followed closely by an
HCPD officer.  Id. ¶ 43.

Plaintiff was directed by an HCPD officer to go into
an interrogation room and remain there.  Id. ¶ 45.  Plaintiff
heard over the police radio that Defendant Jelsma had arrived at
the Pahoa station, id. ¶ 46, and went to the doorway to meet
him, id. ¶ 47.  Plaintiff asked Defendant Jelsma when he was
going to conduct the Advice of Rights ("AOR") so that Plaintiff
could leave, as Defendant Jelsma had earlier said Plaintiff
could do.  Id.  Plaintiff again displayed the ID Card to
Defendant Jelsma and said that, under LEOSA, he was permitted to
carry concealed firearms.  Id. ¶ 48.  Defendant Jelsma ignored

Plaintiff and would not look at the ID Card.  Id. ¶ 49.
Plaintiff attempted to hand the ID Card to Defendant Jelsma, who
would not take it.  Id. ¶ 50.

Plaintiff asked Defendant Jelsma if the HCPD intended
to do anything about Brooks, but Defendant Jelsma instructed
Plaintiff to "wait." Id. ¶ 51.  Plaintiff asked Defendant Jelsma
if he was under arrest, to which Defendant Jelsma responded,
"No!" Id. ¶ 52.  Plaintiff inquired if he was free to leave, and
again, Defendant Jelsma said, "No!" Id. ¶ 53.  Confused,
Plaintiff sought clarification, stating that he was not under
arrest but he was not free to go.  Id. ¶ 54.  Defendant Jelsma
responded loudly, "No, you are not under arrest, but you are not
free to leave." Id. ¶ 55.  When Plaintiff repeated Defendant
Jelsma's statement, the latter confirmed: yes, the Plaintiff was
not under arrest, and "Yes, you can't leave; you need to wait."
Id. ¶ 57.

At this point, in order to test Defendant Jelsma's
intentions and determine whether he was under arrest, Plaintiff
declared himself to be thirsty and asked Defendant Jelsma if he
could retrieve his hydro-flask full of water from his truck.
Id. ¶ 60.  Defendant Jelsma allowed Plaintiff to retrieve his
hydro-flask under armed police escort.  Id.¶ 61.  Upon his
return to the interrogation room, Plaintiff against asked
Defendant Jelsma if he planned on conducting any investigation

into Brooks and his threats against Plaintiff's son, but Defendant Jelsma ignored Plaintiff.  Id. ¶ 62.

Plaintiff got the clear impression that Defendant Jelsma was unconcerned with Brooks and with the safety of Plaintiff's son, and, because of Defendant Jelsma's statements and demeanor, that Defendant Jelsma was trying to discredit Plaintiff and ruin his reputation in the community.  Id. ¶¶ 63, 64.  From the interrogation room, Plaintiff could clearly hear Defendant Jelsma's voice from an adjacent room as he conversed with other officers, trying to find any and every possible violation of the law for which they could arrest Plaintiff.  Id. ¶ 66.

At approximately 2 p.m., an HCPD officer, under Defendant Jelsma's orders, placed Plaintiff under arrest for three counts of terroristic threatening in the first degree and six firearm violations.  Id. ¶ 67.  Before being placed under arrest, Plaintiff again displayed his ID Card and informed the arresting officer that, under LEOSA, he was permitted to carry concealed weapons.  Id. ¶ 68.  Plaintiff attempted to hand his ID Card to the arresting officer, but the officer would not accept or examine it, id., but instead informed Plaintiff that Defendant Jelsma's mind was made up, id. ¶ 69.  In violation of HCPD standard operating procedure, Plaintiff was given no information regarding the identity of the person he was supposed

to have threatened, or about his alleged firearms violations.
Id. ¶¶ 70-71.  After Plaintiff's arrest, Detective Kelii, an
HCPD officer, informed him that the prosecuting attorney for the
County of Hawai`i had been contacted and had advised Defendant
Jelsma to release Plaintiff because, under LEOSA, Plaintiff
should not have been arrested.  Id. ¶ 72.  Plaintiff was
released, pending further investigation, after over four hours
in custody.  Id. ¶ 73.  In violation of HCPD standard operating
procedure, Plaintiff was given no information about his arrest
after his release from custody.  Id. ¶ 74.

        Shortly after Plaintiff's arrest, Defendant Jelsma and
the County of Hawai`i (together, "the County Defendants") issued
two media releases about Plaintiff's arrest and charges.  Id. ¶
75.  The first, issued on January 26, 2017, read in relevant
part as follows:

        HPD Investigating 'Shots Fired' Report in
        Puna

        Hawai`i Island police are investigating a
        firearms incident initially reported as
        "gunshots fired" in the Hawaiian Paradise
        Park subdivision in lower Puna.  Responding
        officers contacted a group of individuals
        near the area where the shots were reported,
        although the preliminary investigation has
        thus far indicated that no shots were fired.
        Detectives assigned to the Criminal
        Investigations Section are continuing the
        investigation.

Rodrigues Decl. ¶ 16; FAC Ex. 4, ECF No. 16-4 at 1. This release was published to the community at large in print media and through text and mobile phone messages. FAC ¶ 75(a). The second, which the Defendants issued on January 27, 2017, included a recent picture of Plaintiff and read thusly:

> <u>Hakalau Man Arrested for Firearms,</u>
> <u>Terroristic Threatening</u>
>
> East Hawai`i detectives arrested a 50-year-old Hakalau man late Thursday afternoon, Jan. 26, as part of their investigation into a firearms incident earlier in the day in Puna.
>
> John Rodrigues Jr. was arrested on suspicion of three counts of first-degree terroristic threatening and six firearms violations. After conferring with prosecutors, police released Rodrigues pending further investigation.
>
> The incident was initially reported as "gunshots fired" in the Hawaiian Paradise Park subdivision in lower Puna at approximately 10 a.m. Responding officers contacted a group of individuals near where the shots were reported and were able to determine that no shots had been fired, although firearms were involved in a confrontation.
>
> Detectives assigned to the Criminal Investigations Section are continuing the investigation[.]

FAC Ex. 4 at 2.

Due to a conflict of interest, the prosecuting attorney for Defendant County of Hawai`i ("County") referred any criminal charges against Plaintiff to the Department of the

Attorney General, State of Hawai`i, which also had a conflict of interest and referred the matter to the prosecuting attorney for the County of Kaua`i.[3]  FAC ¶ 77.  On or about August 17, 2017, the prosecuting attorney for the County of Kaua`i informed Plaintiff that he would not pursue any criminal action against Plaintiff, closed the case against Plaintiff, and notified the Department of the Attorney General, State of Hawai`i, about the decision.  Id. ¶ 79.  The Department of the Attorney General also decided not to prosecute Plaintiff.  Id. ¶ 80.  In a conversation with Plaintiff, Mitch Roth, the prosecuting attorney of the County of Hawai`i, stated that under LEOSA Plaintiff was allowed to carry concealed firearms.  Id. ¶ 82.

After Plaintiff's arrest, Brooks appeared at Plaintiff's son's workplace and threatened him; the County Defendants did not intervene.  Id. ¶ 76.

## PROCEDURAL BACKGROUND

On January 9, 2018, Plaintiff filed a complaint in state court against the County, Defendant Jelsma, Doe Persons 1–10, Doe Corporations 1–10, Roe "Non-Profit" Corporations 1–10, and Roe Governmental Entities 1–10 (collectively, "Doe Defendants").  ECF No. 1-2.  The complaint alleged eight counts: (1) violation of 42 U.S.C. § 1983 ("§ 1983") by Defendant

---

[3] The conflicts of interest stemmed from Plaintiff having served as a witness in felony cases handled by the at-issue offices. FAC ¶ 78.

Jelsma; (2) violation of § 1983 by the County; (3) false
arrest/false imprisonment; (4) defamation "per se"; (5)
defamation "per quod"; (6) false light; (7) intentional
infliction of emotional distress ("IIED"); and (8) negligent
infliction of emotional distress ("NIED"). Id. ¶¶ 710–132. On
January 18, 2018, the County Defendants filed a notice of
removal with this Court. ECF No. 1. The County Defendants
filed a motion to dismiss on January 26, 2018. ECF No. 5. On
April 20, 2018, the Court entered an order granting the motion
and dismissing all of Plaintiffs' claims without prejudice
("April 20, 2018 Order"). ECF No. 14. In the April 20, 2018
Order, the Court gave Plaintiff thirty days to file an amended
complaint. Id. at 34.

On May 17, 2018, Plaintiff filed the FAC, alleging the
same eight claims as alleged in the original complaint. ECF No.
16. Along with the FAC, Plaintiff filed nine exhibits and five
declarations. See ECF Nos. 16-1-16-14. The County Defendants
filed the instant Motion to Dismiss ("Motion"), ECF No. 17, and
an accompanying memorandum ("MTD"), ECF No. 17-1, on May 21,
2018. A hearing on the Motion was originally scheduled for
September 4, 2018, ECF No. 18, but was continued until November
13, 2018, at the Court's request, ECF No. 22. On October 23,
2018, Plaintiff filed an opposition ("Opposition" or "Opp.") to
the Motion. ECF No. 24. The County Defendants filed a reply

13

("Reply") on October 31, 2018.  The Court held a hearing on the Motion on Tuesday, November 13, 2018.

**STANDARD**

Federal Rule of Civil Procedure ("Rule") 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Court may dismiss a complaint either because it lacks a cognizable legal theory or because it lacks sufficient factual allegations to support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).

In resolving a Rule 12(b)(6) motion, the Court must accept all well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff.  Sateriale v. R.J. Reynolds Tobacco Co., 697 F.3d 777, 783 (9th Cir. 2012). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are

14

plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). But "[t]he plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

When the Court dismisses a complaint pursuant to Rule 12(b)(6), it should grant leave to amend unless the pleading cannot be cured by new factual allegations. OSU Student All. v. Ray, 699 F.3d 1053, 1079 (9th Cir. 2012).

## DISCUSSION

### I.    Count I: § 1983 Against Defendant Jelsma

"Section 1983 provides a cause of action against state actors who violate an individual's rights under federal law." Filarsky v. Delia, 566 U.S. 377, 380 (2012) (citing 42 U.S.C. § 1983). The County Defendants move to dismiss Plaintiff's § 1983 claim against Defendant Jelsma on the basis of qualified immunity.  MTD at 2.  Qualified immunity shields government officials who perform discretionary functions from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457
U.S. 800, 818 (1982). In deciding whether a government official
is entitled to qualified immunity in a § 1983 action, courts
must determine: (1) the federal constitutional or statutory
right allegedly violated; (2) whether the right was clearly
established[4]; and (3) whether a reasonable official would have
believed the official's conduct to be lawful. <u>Hamilton v.
Endell</u>, 981 F.2d 1062, 1066 (9th Cir. 1992) (citing <u>Romero v.
Kitsap County</u>, 931 F.2d 624, 627 (9th Cir. 1991)).

Whether an official is protected by qualified immunity
often turns on the "objective legal reasonableness" of his
action. <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987). If
the action at issue is an allegedly unlawful arrest, "the two
prongs of the qualified immunity analysis can be summarized as:
(1) whether there was probable cause for the arrest; and (2)
whether it is reasonably arguable that there was probable cause
for arrest—that is, whether reasonable officers could disagree
as to the legality of the arrest such that the arresting officer
is entitled to qualified immunity." <u>Rosenbaum v. Vashoe Cty.</u>,
663 F.3d 1071, 1076 (9th Cir. 2011); <u>see also</u> <u>Hunter v. Bryant</u>,
502 U.S. 224, 226-27 (1991) (qualified immunity will shield the

---

[4] To analyze whether a right was clearly established, courts
attribute to defendants knowledge of constitutional developments
at the time of the alleged violations, including all available
case law. <u>Fed. Deposit Ins. Corp. v. Henderson</u>, 940 F.2d 465,
477 (9th Cir. 1991).

arresting officers if a reasonable police officer would have believed that probable cause existed to arrest the plaintiff).

Here, the FAC again alleges that Defendant Jelsma deprived Plaintiff of his Fourth Amendment right to be free from arrest unsupported by a warrant or probable cause.  FAC ¶¶ 102–03.  Plaintiff also alleges that his arrest violated LEOSA and thus his federal right to carry concealed weapons.  Id.

### a. Fourth Amendment

The central issue in Plaintiff's Fourth Amendment claim, as with the original Complaint, is whether Defendant Jelsma had probable cause to arrest Plaintiff, and, if he did not, whether a reasonable officer in Defendant Jelsma's position would have believed that he had probable cause in light of clearly established law and the information he possessed.  See Hunter, 502 U.S. at 227.

The Fourth Amendment confers the right to protection from arrest without probable cause.  Beck v. Ohio, 379 U.S. 89, 91 (1964).  Thus, "a claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification."  Dubner v. City and Cty. of San Francisco, 266 F.3d 959, 964 (9th Cir. 2001) (emphasis added).  Courts have explained that "[p]robable cause to arrest or detain is an absolute defense to any claim under § 1983 against police officers for wrongful

arrest . . . as the lack of probable cause is a necessary element" of the claim.  <u>Lacy v. Cty. of Maricopa</u>, 631 F.Supp.2d 1183, 1193 (D. Ariz. 2008); <u>see also</u> <u>Hart v. Parks</u>, 450 F.3d 1059, 1069 (9th Cir. 2006) ("Because police had probable cause to arrest him, Hart's false arrest claim necessarily fails." (citation omitted)).

Probable cause to arrest exists "when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." <u>Fayer v. Vaughn</u>, 649 F .3d 1061, 1064 (9th Cir. 2011) (quoting <u>United States v. Lopez</u>, 482 F.3d 1067, 1072 (9th Cir. 2007)); <u>Michino v. Lewis</u>, No. CIV. 13-00546 ACK, 2015 WL 3752503, at *5 (D. Haw. June 16, 2015) ("A warrantless arrest is lawful under the Fourth Amendment . . . if it is accompanied by probable cause to believe that the arrestee has committed, or is committing, an offense." (citation and internal quotation marks omitted)).

The U.S. Supreme Court has recently indicated that probable cause can rest on an objectively reasonable but mistaken understanding of the law.  While the explicit holding of <u>Heien v. North Carolina</u>, 135 S. Ct. 530 (2014), is that "reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition," <u>id.</u> at 536, the Supreme

Court's reasoning has similar implications in the probable-cause context:

> As the text indicates and we have repeatedly affirmed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" <u>Riley v. California</u>, 573 U.S. ––––, ––––, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014) (some internal quotation marks omitted). To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them "fair leeway for enforcing the law in the community's protection." <u>Brinegar v. United States</u>, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). We have recognized that searches and seizures based on mistakes of fact can be reasonable. The warrantless search of a home, for instance, is reasonable if undertaken with the consent of a resident, and remains lawful when officers obtain the consent of someone who reasonably appears to be but is not in fact a resident. See <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 183–186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). By the same token, if officers with probable cause to arrest a suspect mistakenly arrest an individual matching the suspect's description, neither the seizure nor an accompanying search of the arrestee would be unlawful. See <u>Hill v. California</u>, 401 U.S. 797, 802–805, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971). The limit is that "the mistakes must be those of reasonable men." <u>Brinegar</u>, supra, at 176, 69 S.Ct. 1302.

> But reasonable men make mistakes of law, too . . . . The officer may be reasonably mistaken on either ground. Whether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: the facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same

> result should be acceptable when reached by
> way of a reasonable mistake of fact, but not
> when reached by way of a similarly
> reasonable mistake of law.

Id.; see also id. at 539 ("The Fourth Amendment tolerates only reasonable mistakes, and those mistakes—whether of fact or of law—must be objectively reasonable." (emphases in original)).

The Ninth Circuit has recognized, in several unpublished cases, the applicability of Heien in the arena of probable cause for arrest. See, e.g., Olsen v. City of Henderson, 648 F. App'x 628, 631 (9th Cir. 2016) ("The issue is whether defendant Nichols had probable cause to believe that the statute was violated, and probable cause exists even if he made a reasonable mistake of law or fact." (citing Heien, 135 S. Ct. at 539)); Lee v. Steinbronn, 671 F. App'x 488, 488 (9th Cir. 2016) ("Even if the Oregon statute did not criminalize Lea's conduct, Steinbronn is entitled to summary judgment on Lea's [§ 1983] unlawful-arrest and –seizure claims based on his reasonable belief that it did." (citing Heien)). A number of other circuits have likewise read Heien to apply to probable cause. See, e.g., United States v. Diaz, 854 F.3d 197, 202–205 (2d Cir. 2017) (relying on Heien and concluding that "Officer Aybar had probable cause to arrest Diaz for a violation of New York's open-container law based on a reasonable belief that an apartment-building stairwell is a public place for purposes of

that law."); <u>Cahaly v. Larosa</u>, 796 F.3d 399, 408 (4th Cir. 2015)

("Even if that determination was wrong as a matter of law,

officers may have probable cause to arrest based on 'reasonable

mistakes of law.'" (quoting <u>Heien</u>, 135 S. Ct. at 536–37)).  And

other district courts in this Circuit have similarly recognized

<u>Heien</u>'s relevance in the probable-cause context.  <u>See, e.g.</u>,

<u>Malek v. Green</u>, No. 17-CV-00263-BLF, 2017 WL 4284117, at *7

(N.D. Cal. Sept. 27, 2017); <u>O'Callaghan v. City of Portland</u>, No.

3:12-CV-00201-BR, 2015 WL 7734012, at *5 (D. Or. Nov. 30, 2015),

aff'd, 736 F. App'x 704 (9th Cir. 2018); <u>United States v.</u>

<u>Washington</u>, No. 2:14-CR-262 JCM GWF, 2015 WL 1540486, at *14 (D.

Nev. Apr. 2, 2015), aff'd, 700 F. App'x 619 (9th Cir. 2017);

<u>Varner v. City of Mesa</u>, No. CV-13-02562-PHX-DGC, 2015 WL 736268,

at *7 n.2 (D. Ariz. Feb. 20, 2015).

  Here, the FAC makes clear that Plaintiff gave officers

consent to search his vehicle.  FAC ¶ 18.  Upon searching

Plaintiff's vehicle, officers recovered a shotgun and a 9mm

handgun.  <u>Id.</u> ¶¶ 33–35.  The Court previously explained that

Plaintiffs' possession of these firearms appeared to violate

Hawaii Revised Statutes ("HRS") § 134-23 or HRS § 134-24.[5]  April

---

[5] HRS § 134-23 provides:

> Except as provided in section 134-5, all
> firearms shall be confined to the
> possessor's place of business, residence, or
> sojourn; provided that it shall be lawful to

(Continued . . .)

20, 2018 Order at 11-13; MTD at 2. Like the Complaint, the FAC contains no allegations showing that the firearms in Plaintiff's vehicle were lawful under either HRS § 134-23 or HRS § 134-24; nor does the FAC allege that Plaintiff's possession of concealed firearms was lawful based on the exemption under HRS § 134-5.[6] When officers performed a vehicle search with Plaintiff's consent and recovered the shotgun and 9mm handgun, therefore, it appeared to them that Plaintiff had committed a felony.

---

(. . .)
>               carry unloaded firearms in an enclosed
>               container from the place of purchase to the
>               purchaser's place of business, residence, or
>               sojourn, or between these places upon change
>               of place of business, residence, or sojourn,
>               or between these places and the following:
>               (1) A place of repair; (2) A target range;
>               (3) A licensed dealer's place of business;
>               (4) An organized, scheduled firearms show or
>               exhibit; (5) A place of formal hunter or
>               firearm use training or instruction; or (6)
>               A police station.

HRS § 134-23 defines the required "enclosed container" as "a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm." Id. Violation of the statute is considered a class B felony. Id. HRS § 134-24 is virtually identical to § 134-23, except that it applies to loaded firearms. A violation of HRS § 134-24 is a class C felony.

[6] HRS § 134-5 provides: that it is legal to carry and use a lawfully acquired rifle or shotgun while engaged in hunting or target shooting, or while going to or from the place of doing so; that no permit is required when a lawfully acquired firearm is lent to any person on a target range for the purpose of target shooting; and that a person may under some circumstances carry unconcealed and use a legally acquired pistol or revolver while actually hunting game mammals.

Plaintiff again argues that Defendant Jelsma lacked probable cause to arrest him because he is authorized to carry multiple concealed weapons under LEOSA.  *E.g.*, Opp. at 17–22. This argument fails.

LEOSA directs that:

> Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified retired law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b).

18 U.S.C. § 926C(a) (emphasis added).  Subsection (d), which sets forth the forms of identification a qualified retired law enforcement officer ("QRLEO") must be carrying in order to lawfully carry a concealed firearm, mandates that a QRLEO carry either:

> (1)  a photographic identification issued by the agency from which the individual separated from service as a law enforcement officer that identifies the person as having been employed as a police officer or law enforcement and indicates that the individual has, not less recently than one year before the date the individual is carrying the concealed firearm, been tested or otherwise found by the agency to meet the active duty standards for qualification in firearms training as established

by the agency to carry a firearm
                    of the same type as the
                    concealed firearm;

                    or

          (2)    (A) a photographic
                    identification issued by the
                    agency from which the individual
                    separated from service as a law
                    enforcement officer that
                    identifies the person as having
                    been employed as a police
                    officer or law enforcement
                    officer;

                    And

                    (B) a certification issued by
                    the State in which the
                    individual resides or by a
                    certified firearms instructor
                    that is qualified to conduct a
                    firearms qualification test for
                    active duty officers within that
                    State that indicates that the
                    individual has, not less than 1
                    year before the date the
                    individual is carrying the
                    concealed firearm, . . . met
                    [certain qualification
                    standards].

Id. § 926C(d)(1)-(2).  Plaintiff does not allege that he had an

identification card satisfying § 926C(d)(1), and Exhibit 2

attached to the FAC confirms that he did not.  See FAC ¶ 104(k)

and ID Card.  Plaintiff instead appears to be attempting to

allege that he satisfied the identification requirements listed

in § 926C(d)(2)(A)-(B).  Those requirements plainly state that a

qualified retired law enforcement officer must be carrying both

24

a photographic identification <u>and</u> a certificate of firearms

qualification meeting certain criteria. <u>See</u> 18 U.S.C. §

926C(d)(2)(A)-(B). But the FAC fails to plausibly allege that

Plaintiff was carrying <u>any</u> certificate of firearms

qualification, let alone one that met the strictures of §

926C(d)(2)(B).[7]

_____

[7] The FAC alleges solely that Plaintiff "had" a certificate, not
that he was carrying it at the time of the vehicle search and
his arrest, as LEOSA requires. <u>See, e.g.</u>, FAC ¶ 95; <u>see also</u> 18
U.S.C. § 926C (conditioning LEOSA's protections on a QRLEO's
"carrying the identification required by subsection (d)"). The
Court noted similar issues regarding both the ID Card and the
certificate when ruling on the original Complaint. <u>See</u> April
20, 2018 Order at 15, 17.

Moreover, the Court notes without finding that the certificate
of qualification the FAC alleges that Plaintiff "had" appears as
though it was deficient under LEOSA at the time of the incident.
<u>See</u> FAC Ex. 8. As stated above, § 926C(d)(2)(B) requires that
Plaintiff be carrying:

> a certification issued by the State in which
> the individual resides or by a certified
> firearms instructor that is qualified to
> conduct a firearms qualification test for
> active duty officers within that State that
> indicates that the individual has, <u>not less
> than 1 year before the date the individual
> is carrying the concealed firearm</u>, . . . met
> [certain qualification standards].

Plaintiff's own allegations in the FAC show that Plaintiff's
certificate—even if he had been carrying it on January 26,
2017—did not entitle him to carry concealed firearms under
LEOSA. Plaintiff alleges only that he "had a certificate
issued on December 28, 2015, which was issued one year before
he started carrying concealed firearms . . . ." FAC ¶ 104l. A
2015-issued certificate necessarily does not show that
Plaintiff met certain firearms qualification standards "not
less than 1 year before" January 26, 2017, as LEOSA requires.
Plaintiff's statement that his certificate "was issued one year
<u>before he started carrying concealed firearms</u>," rather than "1
(Continued . . .)

25

However, taking the FAC's factual allegations as true, Defendant Jelsma repeatedly refused to examine the ID Card, e.g., FAC at ¶¶ 20, 22, 48-49, 50, and thus did not know that Plaintiff did not meet LEOSA's identification requirements and could not avail himself of its protection. The ID Card did not in fact meet the strictures of § 926C(d)(1) because it did not indicate that Plaintiff had met "the active duty standards for qualification in firearms training" within the previous year. But, for all Defendant Jelsma knew, it might have been the type of identification card that reflected both of LEOSA's identification requirements, and no additional authentication may have been necessary. Therefore, the infirmity of Plaintiff's identification to establish that he was entitled to LEOSA's protections was not within Defendant Jelsma's knowledge. Instead, what <u>was</u> within Defendant Jelsma's knowledge was that Plaintiff was carrying two concealed firearms in violation of Hawai`i state law and was asserting that LEOSA's protections applied, trumping Hawai`i law and rendering his conduct legal.

---

(. . .)
year <u>before the date the individual is carrying the concealed firearm</u>" evidences a flawed understanding of § 926C(d)(2)(B)'s requirements.

Plaintiff, through his attorney, asserted at the hearing on this Motion that Plaintiff was carrying a certificate of firearms qualification on January 26, 2017. But "[t]he focus of any Rule 12(b)(6) dismissal . . . is the complaint," <u>Schneider</u>, 151 F.3d at 1197 n.1, and Plaintiff has not properly alleged that he was carrying a certificate on January 26, 2017.

It is true that a police officer may not ignore exculpatory evidence that would negate a finding of probable cause. <u>Yousefian v. City of Glendale</u>, 779 F.3d 1010, 1014 (9th Cir. 2015).  But here, the application of LEOSA may well not have been exculpatory, because Plaintiff had two weapons in his vehicle.  Given the Court's earlier findings, the remaining issue is whether Defendant Jelsma had probable cause to believe that Hawai`i's firearms laws[8] were violated, even assuming that Plaintiff was carrying the proper identification on January 26, 2017 and thus was entitled to LEOSA's protection.

LEOSA, by its terms, supersedes state-law prohibitions regarding the carrying of concealed firearms by QRLEOs (with exceptions not applicable here).  <u>See</u> 18 U.S.C. § 926C(a).  The parties are vociferous in arguing over whether LEOSA permits a qualified individual to carry a single concealed firearm or multiple concealed firearms.  The Court need not and does not decide which is the correct reading, because even if Defendant

---

[8] The MTD does not address, and therefore the Court does not decide, the issue of whether Defendant Jelsma had probable cause to arrest Plaintiff for terroristic threatening.  Because a claim for false arrest focuses on the validity of the arrest, not of each individual charge, the existence of probable cause for any of the charges made will cause a claim for false arrest to fail.  <u>Lacy v. Cty for Maricopa</u>, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008) (collecting cases); <u>see also</u> <u>Barry v. Fowler</u>, 902 F.2d 770, 773 n.5 (9th Cir. 1990) (noting that, because the defendant officer had probable cause to arrest plaintiff for one charge, the arrest was not unconstitutional even if probable cause for another charge was lacking).

Jelsma was mistaken—that is, even if LEOSA does in fact permit a qualified individual to carry multiple concealed weapons, such that LEOSA operated to protect both of Plaintiff's guns—Defendant Jelsma's mistake of law was an objectively and eminently reasonable one.  In other words, regardless of which reading of LEOSA is correct, Defendant Jelsma had "knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense ha[d] been or [wa]s being committed by the person being arrested," Fayer, 649 F.3d at 1064 (citations omitted), and thus had probable cause to arrest Plaintiff, see, e.g., Heien, 135 S. Ct. at 536, 539; Olsen, 648 F. App'x at 631; Diaz, 854 F.3d at 202–03.

The reading of LEOSA that would lead a reasonable officer in Defendant Jelsma's shoes (and with his knowledge) to conclude that Plaintiff was violating Hawai`i state law by carrying at least one non-LEOSA-protected weapon in an illegal manner is not just objectively reasonable—it is the most reasonable interpretation.  LEOSA provides that a QRLEO who is carrying the identification required by § 926C(d) "may carry a concealed firearm[.]" 18 U.S.C. § 926C(a).  The County Defendants point to the indisputably singular wording of that portion of LEOSA, as well as to similar construction elsewhere: the statute's definition, in § 921(a)(3), of "firearm" to mean "(A) any weapon . . . ; (B) the frame or receiver of such

weapon; (C) any firearm muffler or firearm silencer; (D) any

destructive device"; and to § 926C(d)(1), which, while

discussing LEOSA's identification requirements, again refers to

"the concealed firearm" in the singular.  MTD at 4.[9]

Because in their view "[t]here is nothing ambiguous"

about LEOSA's language, the County Defendants, citing inapposite

cases,[10] assure the Court that "there is no need" to undertake "a

squishy inquiry" by "descend[ing] into the mushy, subjective

morass that is legislative intent." Reply at 2.  While disputing

the County Defendants' premise,[11] the Court agrees with their

conclusion: A deep dive into legislative intent is unnecessary,

because the Court need not make a definitive ruling regarding

---

[9] In advancing this argument in their Reply, counsel for the
County Defendants refer to Plaintiff as "John ~~Rambo~~ Rodrigues."
Reply at 5.  The Court finds this lack of decorum to be highly
inappropriate.
[10] Defendants cite <u>Chevron USA v. Natural Res. Def. Council</u>, 467
U.S. 837, 842-44 (1984) and <u>Royal Foods Co. v. RJR Holdings,
Inc.</u>, 252 F.3d 1102, 1106 (9th Cir. 2001).  <u>See</u> MTD at 4; Reply
at 2.  These cases' discussions of statutory interpretation take
place in the context of administrative law and, like <u>Chevron</u>
deference itself, are wholly inapposite here.
[11] The U.S. Supreme Court has noted that, while
> [t]he starting point in every case involving
> construction of a statute is the language
> itself[,] . . . ascertainment of the meaning
> apparent on the face of a single statute
> need not end the inquiry. . . . The
> circumstances of the enactment of particular
> legislation may persuade a court that
> Congress did not intend words of common
> meaning to have their literal effect.

<u>Watt v. Alaska</u>, 451 U.S. 259, 265-66 (1981) (citations and
internal quotation marks omitted).

the scope of LEOSA's protections in order to discern whether or not Defendant Jelsma's arrest of Plaintiff was supported by probable cause. Because an objectively reasonable mistake of law can support probable cause, the Court need only resolve the question of whether it is objectively reasonable to interpret LEOSA to entitle a QRLEO to carry one concealed weapon and no more. The Court finds that it is.

Plaintiff argues along several lines that LEOSA permits a QRLEO to conceal and carry multiple firearms. These arguments are strained and unconvincing,[12] but even if it were

---

[12] Plaintiff makes three arguments, none of which appears meritorious.

First, Plaintiff argues that "LEOSA's plain and ordinary meaning permits and anticipates possession of multiple firearms." Opp. at 17–19. In support of this proposition, Plaintiff cites to § 926C(b)'s use of "firearms" in the plural, as in,

This section shall not be construed to supersede or limit the laws of any State that—
(1) permit private persons or entities to prohibit the possession of concealed firearms on their property; or
(2) prohibit or restrict the possession of firearms on any State or local government property, installation, building, or park.

(emphasis Plaintiff's). Plaintiff also notes that § 921(a)(3) defines "firearm" using the word "any," as in "any weapon . . . ", and that the first, third, and seventh definitions of "any" in Random House Webster's unabridged dictionary provide, respectively, that "any" can mean "one or more without specification," "some," or "a quantity or number." Opp. at 18. Therefore, Plaintiff concludes, "the plain and ordinary meaning" of LEOSA is that a QRLEO may conceal and carry more than one firearm. Opp. at 18–19. This reading of the statute is
(Continued . . .)

not so, it is simply, inherently, and objectively reasonable to

read LEOSA's provision that "an individual who is a qualified

retired law enforcement officer . . . may carry a concealed

---

(. . .)

strained at best.  Section 926(b)'s use of the plural "firearms"
is the logical corollary of restrictions or prohibitions
regarding the presence of all firearms—not just one—on
particular property.  And section 921(a)(3)'s definition of
"firearm" pairs the word "any" with the singular "weapon"—a
pairing that not only makes logical sense in the context of the
definition of a singular word, but makes it most natural to read
"any" as "a [weapon] no matter which," OXFORD DICTIONARY (2d ed.
1989)—in other words, as referring to a single firearm.

     Plaintiff's second argument is along the same lines
and fares no better.  Citing the statutory interpretation canon
of *in pari materia*, Plaintiff argues, essentially, that § 926C's
"a concealed weapon" ought to be read to denote multiple
concealed weapons because such a reading would render it
consistent with other portions of LEOSA where the plural is
used, including those discussed above and the mention of
"firearms training" in §§ 926C(c)(4), (d)(1), and (d)(2)(B).
Opp. 19-20.  But the Court does not perceive how the use of a
term of art like "firearms training," or the use of the plural
"firearms" in the above-cited contexts, contradicts or indeed
affects the natural reading of § 926C(a): That, under LEOSA, a
QRLEO may carry one concealed firearm.

     Plaintiff's third argument also fails.  Quoting at
length from Senator Edward M. Kennedy's minority views on LEOSA
as contained in Senate Report 108-29, Plaintiff misunderstands
Senator Kennedy's objections regarding the <u>type</u> of weapons LEOSA
would permit qualified individuals to conceal and carry as being
directed at the <u>number</u> of weapons at issue.  <u>See</u> Opp. at 20-22
(citing S. Rep. No. 108-29, at 16 (2003)).

     Plaintiff nowhere cites to any case holding that LEOSA
permits a qualified individual to carry and conceal more than
one weapon.  <u>See generally</u> Opp.  However, the Court acknowledges
that there are apparently no cases discussing whether LEOSA
permits a QRLEO to carry only one concealed weapon or multiple
concealed weapons.  Moreover, the Court believes that it would
be prudent for Congress to consider allowing a qualified law
enforcement officer or a QRLEO to carry a concealed automatic
rifle in addition to a handgun, because, in the current era,
terrorists and criminals now often use automatic rifles.

firearm" as contemplating that a single QRLEO is permitted to carry a single concealed weapon.

Because any mistake of law Defendant Jelsma made in determining that LEOSA protected, at most, one of the two guns Plaintiff was carrying in violation of Hawai`i state law was objectively reasonable, his arrest of Plaintiff for firearms violations was supported by probable cause. See Heien, 135 S. Ct. at 536, 539; Olsen, 648 F. App'x at 631; Diaz, 854 F.3d at 202–03. Defendant Jelsma therefore did not violate Plaintiff's Fourth Amendment right to be free from arrest unsupported by a warrant or probable cause.

**b. LEOSA**

In addition to his Fourth Amendment claim, Plaintiff alleges that his arrest violated LEOSA, FAC ¶ 102(b), and thus his "federal right to carry concealed weapons," id. ¶ 103. In his Opposition, Plaintiff cites a D.C. Circuit case holding that LEOSA creates, for qualified individuals, a federal right to carry concealed weapons that may be vindicated under § 1983, see Opp. at 15–16 (citing Duberry v. District of Columbia, 824 F.3d 1046 (D.C. Cir. 2016)).[13] But the portion of Plaintiff's § 1983 claim that is premised on Defendant Jelsma's alleged violation

---

[13] Curiously, Plaintiff cites this case not for the proposition that LEOSA creates a private right actionable under § 1983, but in order to support his contention—which Defendants do not dispute—that LEOSA preempts state law. See Opp. at 15–17.

of Plaintiff's "federal right to carry concealed weapons" cannot stand, because Plaintiff has not established that he had such a right on January 26, 2017.

In any event, the Court is somewhat doubtful that any right created by LEOSA was "clearly established" on January 26, 2017, as would be necessary for Plaintiff to maintain this claim against Defendant Jelsma. See Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) ("Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." (citation omitted)); see also id. at 741 (in order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate"); Burban v. City of Neptune Beach, No. 3:17-CV-262-J-34JBT, 2018 WL 1493177, at *6 (M.D. Fla. Mar. 27, 2018) (noting that, "both before and after Duberry, district courts . . . have reached a contrary conclusion" on the question of whether LEOSA confers a right vindicable under § 1983) (collecting cases). But even assuming arguendo that LEOSA does create a federal right actionable under § 1983, and that that right was clearly established on the date in question, Plaintiff has, as explicated above, failed to allege that he in fact met LEOSA's identification requirements

on January 26, 2017—requirements on which LEOSA's protection is conditioned.  See 18 U.S.C. § 926C(a).  Because LEOSA's protection did not apply to Plaintiff during the at-issue events, his arrest cannot have violated any rights secured to him by LEOSA.

In sum, Defendant Jelsma has no need of qualified immunity because he did not violate Plaintiff's constitutional or statutory rights.  In the absence of such a violation, Plaintiff's § 1983 claim cannot stand.[14]  The Court thus dismisses Count I against Defendant Jelsma without prejudice.

## II.  Count II: § 1983 Against the County

The County Defendants argue that Plaintiff's § 1983 claim against the County should be dismissed because Plaintiff was not deprived of a federal constitutional or statutory right. MTD at 5.  Section 1983 provides a remedy for the deprivation of a right secured by the Constitution or federal statutes by any person under color of state law.  42 U.S.C. § 1983; Maine v. Thiboutot, 448 U.S. 1, 4 (1980); Gibson v. U.S., 781 F.2d 1334, 1338 (9th Cir. 1986).  "Persons" covers "state and local officials sued in their individual capacities, private

[14] The Court notes that if probable cause for the arrest had been absent, Defendant Jelsma would be entitled to qualified immunity—and Plaintiff's § 1983 claim for unlawful arrest would fail—because it was at the very least reasonably arguable that there was probable cause for the arrest.  See Rosenbaum, 663 F.3d at 1076 (citation omitted).

individuals and entities which acted under color of state law, and local governmental entities." Vance v. Cty. of Santa Clara, 928 F. Supp. 993, 995-96 (N.D. Cal. 1996). For an official capacity suit, municipalities and their agents must cause the violation of a plaintiff's federal constitutional or statutory right through a policy or custom. Monell, 436 U.S. at 694.

The FAC establishes that Defendant Jelsma and other law enforcement officers had probable cause to arrest Plaintiff. See Section I(a), supra. For that reason, Defendant Jelsma and other officers did not violate a federal constitutional right under the Fourth Amendment. Moreover, on January 26, 2017, Plaintiff was not carrying the identification required in order to avail himself of LEOSA's protection, and therefore he cannot have had any federal right to concealed carry under LEOSA. See Section I(b), supra. Absent an underlying violation of Plaintiff's federal constitutional or statutory rights, there can be no Monell liability against the County. Quintanilla v. City of Downey, 84 F.3d 353, 355 (9th Cir. 1996) ("[A] public entity is not liable for § 1983 damages under a policy that can cause constitutional deprivations, when the factfinder concludes that an individual officer, acting pursuant to the policy, inflicted no constitutional harm to the plaintiff."); see also City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional [or statutory] injury at

35

the hands of the individual police officer[,]" any alleged
authorization by the department "is quite beside the point.");
Monell, 436 U.S. at 694.

In light of the fact that Plaintiff was not deprived
of either a federal constitutional or statutory right, the Court
dismisses Count II against the County without prejudice.

### III. Count III: False Arrest/False Imprisonment Against the County Defendants

The FAC's state-law false arrest/false imprisonment
claim[15] fails for the reasons explained in the April 20, 2018
Order.  ECF No. 14 at 23-25.  A determination that the arresting
officer "had probable cause is a defense to the common law
claims of false arrest[] [and] false imprisonment[.]"  Reed, 76
Haw. at 230, 873 P.2d at 109 (citing House v. Ane, 56 Haw. 383,
390-91, 538 P.2d 320, 325-26 (1975) and Towse v. State, 64 Haw.
624, 635, 647 P.2d 696, 704 (1982)); Freeland v. Cty of Maui,
No. CIV. 11-00617 ACK-KS, 2013 WL 6528831, at *19 (D. Haw. Dec.
11, 2013) ("Probable cause is an affirmative defense to the
claim of false imprisonment." (citation omitted)); see also MTD
at 6.  Defendant Jelsma made a warrantless arrest of Plaintiff
after he "saw and observed what reasonable persons would believe

---

[15] Because "a person who is falsely arrested is at the same time
falsely imprisoned, false arrest and false imprisonment as tort
claims are distinguishable only in terminology."  Reed v. City &
Cty. of Honolulu, 76 Haw. 219, 230, 873 P.2d 98, 109 (1994).

to be an offense being committed in [his] presence." House, 56
Haw. at 391, 538 P.2d at 326; see also April 20, 2018 Order at
23. Accordingly, Plaintiff's detention and restraint were
lawful, and his false arrest/false imprisonment claim, Count
III, is dismissed without prejudice.

**IV. Counts IV–VI: Defamation "Per Se," Defamation "Per Quod," and False Light Against the County Defendants**

The County Defendants move to dismiss Plaintiff's
claims for defamation and false light because "the two
purportedly-false statements, which [Plaintiff] alleges injured
him, are, in fact, true." MTD at 6. A claim for defamation has
four elements under Hawaii Law: "(1) a false and defamatory
statement concerning another; (2) an unprivileged publication to
a third party; (3) fault amounting at least to negligence . . .
; and (4) either actionability of the statement irrespective of
special harm or the existence of special harm caused by the
publication." Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd.,
100 Haw. 149, 171, 58 P.3d 1196, 1218 (2002) (alteration in
original) (citation omitted).[16] The truth of the allegedly

---

[16] "Although false-light and defamation claims are not identical,
there is a substantial overlap between the claims. Courts have
held that where . . . a false-light claim is based on the same
statements as a defamation claim, the false-light claim must be
dismissed if the defamation claim is dismissed." Wilson v.
Freitas, 121 Haw. 120, 130, 214 P.3d 1110, 1120 (Ct. App. 2009)
(citation omitted); see also Nakamoto v. Kawauchi, 142 Haw. 259,
271, 418 P.3d 600, 612 (2018) (quoting Wilson). The Court will
(Continued . . .)

defamatory statement "is a complete defense to an action for defamation," and the "[l]iteral truth of a publication need not be established, only that the statement is 'substantially true.'" Basilius v. Honolulu Pub. Co., 711 F. Supp. 548, 551 (D. Haw. 1989), aff'd sub nom. Polycarp Basilius v. Honolulu Pub. Co., 888 F.2d 1394 (9th Cir. 1989) (citations omitted); see also Kohn v. West Hawaii Today, Inc., 65 Haw. 584, 590, 656 P.2d 79, 83 (1982) ("[I]t is sufficient if the substance, the gist, the sting, of the matter is true." (citation omitted)).

The defamation and false light claims in the FAC focus on two media releases the County Defendants issued following Plaintiff's arrest. See FAC ¶¶ 75, 135, 150, 158. The FAC also attaches several declarations from individuals who read the releases and related articles, and believe that they damaged Plaintiff's reputation and standing in his community. See, e.g., FAC ¶¶ 138, 140; Declaration of Alvin T. Aoki ("Aoki Decl.), ECF No. 16-11; Declaration of Antoinette Bello ("Bello Decl."), ECF No. 16-12. Although Plaintiff has significantly supplemented his defamation and false light allegations compared to those in the original Complaint, he again fails to show that the County Defendants made a false statement. In the absence of

---

(. . .)
again analyze Plaintiff's false light claim together with his defamation claims. See April 20, 2018 Order, ECF No. 14 at 25 n.10.

a false statement, Plaintiff cannot state a claim for defamation or false light.

As the Court explained in the April 20, 2018 Order, statements reporting Plaintiff's arrest and charges alone cannot be defamatory. April 20, 2018 Order, ECF No. 14 at 27. This is because Plaintiff was in fact arrested and charged with criminal violations. FAC ¶ 67; Basilius, 711 F. Supp. at 551–52 (rejecting argument that a publication's materially accurate report of murder allegations implied that plaintiff had actually committed the murder); see also Martin v. Hearst Corp., 777 F.3d 546, 553 (2d Cir. 2015) ("The news reports at issue in this case . . . . simply state that [the plaintiff] was arrested and criminally charged, both of which [she] admits are true. Reasonable readers understand that some people who are arrested are guilty and that others are not. Reasonable readers also know that in some cases individuals who are arrested will eventually have charges against them dropped."); Wilson v. Freitas, 121 Haw. 120, 131, 214 P.3d 1110, 1121 (Ct. App. 2009), as amended (Aug. 4, 2009) ("Accurately identifying someone as a suspect in a criminal investigation does not constitute an accusation of guilt and cannot support a claim for defamation, even if the plaintiff proves he is not guilty").

However, Plaintiff now points to specific portions of the media releases that he alleges were false and defamatory.

<u>E.g.</u>, FAC ¶¶ 75(a)-(b), 135(a), 135(b), 158.  Plaintiff first claims that the media releases' statement that a "group of individuals" were involved in an incident in which gunshots may have been fired was false.  FAC ¶ 135(a).  But Plaintiff's summary of the releases' actual statement is inaccurate; the "group" referred to was, in both releases, a "group of individuals near the area where the shots were reported" whom "[r]esponding officers contacted." FAC Ex. 4 at 8, 9.  And the FAC itself alleges that HCPD officers spoke to witnesses to the confrontation.  FAC ¶ 13.  Under these circumstances, and taking Plaintiff's allegations as true, this portion of the media releases is accurate.

Second, Plaintiff contends that the releases' statement that "firearms were involved in a confrontation," FAC Ex. 4 at J.R. 9, was false and defamatory.  Plaintiff alleges, however, that the January 26, 2017, incident involved: (1) Brooks brandishing and discharging a firearm; and (2) the recovery of two firearms from Plaintiff's vehicle.  FAC ¶¶ 13, 33.  Although Plaintiff seems to argue that the statement is false because only Brooks's firearm was "involved in the confrontation"—not the multiple firearms found in Plaintiff's vehicle—the Court finds this statement at least "substantially true." <u>Basilius</u>, 711 F. Supp. at 551 (citation omitted).  Truth "is a complete defense to an action for defamation," <u>Basilius</u>,

711 F. Supp. at 551, and thus the statement that "firearms were involved in a confrontation," FAC Ex. 4 at J.R. 9, cannot serve as the basis of Plaintiff's defamation claims under these circumstances.  The Court dismisses Counts IV, V, and VI without prejudice.

**V.     Counts VII and VIII: IIED and NIED Against the County Defendants**

Plaintiff asserts IIED and NIED claims against the County Defendants.  FAC ¶¶ 166-76.  As pled in the FAC, and as stated in the April 20, 2018 Order, ECF No. 14 at 30, 32, Plaintiff's IIED and NIED claims are derivative of his § 1983 claims—which, as discussed above, are not viable.  "Once the underlying constitutional claims are dismissed, there is no basis for an IIED claim. . . . [and] [o]nce the underlying constitutional claims are dismissed, the NIED claim, like the IIED claim, fails." Luzon v. Atlas Ins. Agency, Inc., 284 F. Supp. 2d 1261, 1263 (D. Haw. 2003).  Because the FAC alleges no viable predicate claim on which Plaintiff's IIED and NIED claims can be based, the Court once again dismisses Counts VII and VIII without prejudice.

**VI.    Doe Defendants**

As the Court iterated in its April 20, 2018 Order, ECF No. 14 at 8-9 n.2, courts generally disfavor the use of Doe defendants.  Wakefield v. Thompson, 177 F.3d 1160, 1163 (9th

Cir. 1999). The Federal Rules of Civil Procedure do not contain a provision permitting a plaintiff's use of fictitious defendants. See Fifty Assocs. v. Prudential Ins. Co., 446 F.2d 1187, 1191 (9th Cir. 1970). In situations where the identity of alleged defendants will not be known prior to the filing of a complaint, however, "the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980); Wilkes v. HCCC Cent. Hosp., Civ. No. 11-00041 HG-BMK, 2011 WL 563987, at *4 (D. Haw. Feb. 7, 2011). When there are named Defendants, such as here, the inclusion of Doe defendants is "simply an inkblot on the pleadings with no procedural or substantive effect on the action." Winnemucca Indian Colony v. U.S. ex rel. Dep't of the Interior, No. 3:11-CV-00622-RCJ-VPC, 2012 WL 2789611, at *7 (D. Nev. July 9, 2012).

Here, the FAC does not contain any specific allegations against the Doe Defendants, and the FAC, unlike the Complaint, does not state that Plaintiff will amend the FAC to state the Doe Defendants' true identities once they are ascertained. These facts, along with the Court's assumption that Plaintiff read and heeded the caution in the April 20, 2018 Order, ECF No. 14 at 8–9 n.2, lead the Court to surmise that the

Doe Defendants' inclusion in the FAC may be the result of inadvertence. The Court again cautions that, if the Doe Defendants remain in any amended complaint that is filed, they may be subject to dismissal in the future.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants County of Hawaii and Samuel Jelsma's Motion to Dismiss the FAC, ECF No. 17, and dismisses all of Plaintiff's claims WITHOUT PREJUDICE.[17]

Plaintiff may file an amended complaint within thirty days of the entry of this Order, provided Plaintiff has a good-faith basis to allege additional facts addressing the issues identified herein. The Court cautions, however, that if Plaintiff is unable to cure the defects identified in this Order, any amended complaint will likely be dismissed with prejudice.

---

[17] While, with the Court required to accept the FAC's allegations as true, it appears that Defendant Jelsma improperly sought to punish Plaintiff, the Court nevertheless finds that Plaintiffs' allegations fail to establish any viable claim as currently pled.

IT IS SO ORDERED.

DATED: Honolulu, Hawai`i, November 20, 2018.



_____
Alan C. Kay
Sr. United States District Judge