IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

```
_____
                                )
JOHN RODRIGUES, JR.,            )
                                )
            Plaintiff,          )
                                )
     v.                         )  Civ. No. 18-00027 ACK-WRP
                                )
COUNTY OF HAWAII; SAMUEL JELSMA, )
individually, DOE PERSONS 1-10; )
DOE PARTNERSHIPS 1-10; DOE      )
CORPORATIONS 1-10; ROE          )
"NON-PROFIT" CORPORATIONS 1-10; )
AND ROE GOVERNMENTAL            )
ENTITIES 1-10,                  )
                                )
            Defendants.         )
_____)
```

## ORDER GRANTING DEFENDANTS COUNTY OF HAWAII AND SAMUEL JELSMA'S MOTION FOR SUMMARY JUDGMENT

This case arises from a 2017 incident involving retired police officer Plaintiff John Rodrigues, Jr. ("Plaintiff") and officers of the Hawai`i County Police Department ("HCPD") that ultimately led to Plaintiff's arrest. Plaintiff brought this lawsuit against the County of Hawai`i (the "County") and Major (formerly, Captain) Samuel Jelsma ("Defendant Jelsma," together with the County, the "County Defendants"), alleging constitutional and civil rights violations related to his treatment and arrest.

The County Defendants have moved for summary judgment, arguing that they are entitled to judgment as a matter of law and no genuine issues of material fact remain. See ECF No. 109

1

("Motion"). For the reasons detailed below, the Court GRANTS the County Defendants' Motion for Summary Judgment.

<u>**FACTUAL BACKGROUND**</u>

The following facts are undisputed and are principally drawn from parties' concise statements of facts ("CSFs") and the evidentiary exhibits attached thereto.

I.      **Plaintiff and Defendant Jelsma**

Plaintiff is a retired police officer who retired in good standing from the force in August 2016, after serving with the HCPD for twenty-six years. <u>See</u> Pl.'s CSF, ECF No. 120, ¶¶ 21, 23. As a result of his service, Plaintiff is considered a "qualified retired law enforcement officer" as that term is defined under 18 U.S.C. § 926C ("LEOSA"). <u>See</u> Ex. 2 to Pl.'s CSF, ECF No. 120-3 (LEOSA identification card); Ex. F to Defs.' CSF, ECF No. 110-7 (same). Defendant Jelsma is a major in the HCPD. At the time of the events at issue in this case, he was a captain.

Plaintiff and Defendant Jelsma have a long history as colleagues since the 1990s. According to Plaintiff, Captain Jelsma has harbored a personal grudge against Plaintiff stemming from several incidents over the years. <u>See</u> Compl. ¶ 77.

## II.        The Events of January 26, 2017

On January 26, 2017, at around 7:30 a.m., Plaintiff
left his home in Hakalau on the Big Island.  Defs.' CSF, ECF No.
110, ¶ 1.  He got into his truck and began driving towards Puna,
apparently with no destination in mind.  Defs.' CSF ¶¶ 2-4.
When he set out that morning, Plaintiff had two loaded firearms
in his truck: (1) a 9mm handgun in a worn leather holster
underneath his driver-side seat and (2) a 12-gauge shotgun in a
soft case in the cab of his truck.  Defs.' CSF ¶¶ 5-6, 12.

A few hours into his drive, around 10:00 a.m.,
Plaintiff encountered one of his son's coworkers, Nathan
Figueroa at the Hawaiian Paradise Park subdivision.  Defs.' CSF
¶ 7.  An altercation followed.  Initially, Plaintiff asked
Figueroa if his first name was "Nathan"—which is indeed
Figueroa's first name—and Figueroa apparently did not recognize
Plaintiff.  It is alleged that Plaintiff displayed his firearms
and said to Figueroa, "I going put one bullet in your fucken
head first."  Defs.' CSF ¶ 7; see also Ex. C to Defs.' CSF, ECF
No. 110-4, at 2 (Plaintiff's HCPD complaint testimony).
According to Figueroa, Plaintiff made several statements
directed toward Figueroa, including "you don't know who you are
fucking with, you fucking with the wrong people and you better
have an army because I do."  Ex. D to Defs.' CSF, ECF No. 110-5,
¶ 5 (Figueroa declaration).  Figueroa also states that Plaintiff

said he would put a bullet in Figueroa's head and that, after asking if Figueroa had kids and cared about his parents, Plaintiff said "if anything happens to [Plaintiff's] son, it would fall back on [Figueroa]." Ex. D to Defs.' CSF ¶¶ 4-9. Plaintiff left the scene without police having been notified, but Figueroa later reported the incident to police, which eventually resulted in Plaintiff's arrest later that day. See Defs.' CSF ¶¶ 7-9, 19; Ex. 6 to Pl.'s CSF, ECF No. 120-15, at 19. After he reported the incident, Figueroa told Detective Kelii that "at first, he felt threatened by [Plaintiff]'s actions," but he ultimately realized Plaintiff was not mad at him, but rather at another individual, Wesley "Mana" Brooks.[1] Plaintiff ultimately left the scene without incident or arrest.[2] See Defs.' CSF ¶¶ 7-9.

---

[1] These facts come from a written incident report filed by Detective Kelii, who interviewed Figueroa at the police station. See Ex. 17 to Pl.'s CSF, ECF No. 120-25, at p. 4 of 10. The Court notes that, at the hearing, it requested that the County Defendants provide the Court with a copy of the audio recording of Detective Kelii's interview with Figueroa, and Plaintiff's counsel indicated his approval of this request. Counsel for the County Defendants promptly provided the recording. See Amended Declaration of D. Kaena Horowitz, ECF No. 128. In reviewing the recording, it appears to be generally consistent with Detective Kelii's written report and Figueroa's declaration. Thus, what the Court heard on the recording has not impacted its conclusions as set forth in this Order.

That said, the Court does not know whether Plaintiff has had the opportunity to listen to the recording himself. In the event Plaintiff has not heard the recording and now objects to the Court having heard it, it should file any objection in the form of a motion for reconsideration. Again, however, the Court notes that the recording did not impact the Court's decision today.

[2] Plaintiff has been indicted on and charged in connection with the incident involving Figueroa. See Ex. 18 to Pl.'s CSF, ECF No. 120-8 (indictment).The criminal trial in Case No. 3CPC-19-0000157 is pending in (Continued . . . )

A short time after the exchange with Figueroa,
Plaintiff parked his truck at 3rd Avenue near Maku`u Drive in
Hawaiian Paradise Park. Defs.' CSF ¶ 9; Pl.'s CSF § 9. There,
he called 9-1-1 and reported that gunshots had been fired.
Pl.'s CSF ¶¶ 32-33; Defs.' CSF ¶¶ 9-10; see also Ex. B to Defs.'
CSF, ECF No. 110-3, at 15. Plaintiff's call was apparently made
in connection with a different confrontation than the earlier
encounter with Figueroa—this later one was with Brooks and
another individual (Lopez). Defs.' CSF ¶ 10; Pl.'s CSF ¶ 10;
see also Pl.'s Opp. 17-18 (distinguishing the Figueroa dispute
from the encounter with Brooks). When police officers arrived
on the scene in response to Plaintiff's call, the officers
requested and Plaintiff allowed them to search his truck.
Defs.' CSF ¶ 11; Pl.'s CSF ¶ 11. In their search, the officers
recovered the two firearms. Defs.' CSF ¶ 12; Pl.'s CSF ¶ 12.

A short time after Plaintiff called 9-1-1, Defendant
Jelsma arrived at the scene. Pl.'s CSF ¶ 34. According to
Plaintiff, he presented to the officers (including Defendant
Jelsma) at the time of the search an HCPD identification card,
which had his picture identifying him as a retired law

---

Hawai`i Circuit Court and the trial is scheduled for February 3, 2020.
Apparently for that reason, Plaintiff has invoked the Fifth Amendment and
refused to answer "[a]ll the questions" involving the encounter with
Figueroa. Ex. B to Defs.' CSF (Plaintiff's deposition) at 101; see also id.
at 99-102.

enforcement officer on one side and stated the following on the reverse side:

> This card is for identification purposes only, pursuant to 18 United Stated [sic] code & 926C(d), Carrying of Concealed Firearms by Qualified Retired Law Enforcement Officers. This identification DOES NOT perm[i]t the holder to carry a concealed firearm pursuant to 18 United States Code & 926C and in of itself is not inte[n]ded to comply with or be applicable to State statutes and administrative rules governing identification for the purpose of carrying a concealed and/or unconcealed firearm.

Ex. F to Defs.' CSF, ECF No. 110-7 (the "ID Card"); Ex. 2 to Pl.'s CSF (same); see also Defs.' CSF ¶¶ 13-14; Pl.'s CSF ¶¶ 13-14. Although Plaintiff now seems to dispute this fact, the evidence shows that he did not present any other certifications or identification, including a "Firearms Qualification Card" qualifying him to carry and use the specified firearms.[3/] See Pl.'s CSF ¶ 15.

---

[3/] Plaintiff appears to frame this as a disputed fact by asserting—without any factual evidence in support—that he did show a qualifications card certifying him to use the firearms. See Pl.'s CSF ¶ 15 (denying County Defendants' assertion that Plaintiff did not show any qualifications card but not pointing to any evidence or making any allegation to show that he in fact did show the card). However, the factual evidence in the record suggests that in fact Plaintiff only showed his ID Card, not any qualifications. See Defs.' CSF ¶ 15. Compare Ex. B. to Defs.' CSF (Plaintiff's deposition) at 46 (Plaintiff confirming that he did not show any other LEOSA documents other than the ID Card to anyone because he didn't "have anything else to show") and Ex. E to Defs.' CSF (Defendants Jelsma's Declaration) ¶ 13 ("At no time – either at the Subject Property or at the Station – did Plaintiff show me any certification of firearms qualification."), with Ex. B to Defs.' CSF at 56 (Plaintiff stating he was "not sure if [he] had this and presented it to anyone" and stating that he showed the ID Card but "[n]ot this [qualification] card") & 62 (Plaintiff stating he was not sure if he had a qualification card on him and that his "main focus" was presenting the ID Card).

6

Regardless of whether Plaintiff presented his Firearms Qualification Card to Captain Jelsma or any other officers that day, Plaintiff had a current certification (issued on February 19, 2016) qualifying him to use and carry a Remington 870 12-gauge shotgun bearing serial number RS01242Y.  Defs.' CSF ¶ 17; see also Ex. H to Defs.' CSF and Ex. 4 to Pl.'s CSF.  See Defs.' CSF ¶¶ 16-18; see also Exs. G & H to Defs.' CSF, ECF Nos. 110-8 & 110-9, and Exs. 4 & 5 to Pl.'s CSF, ECF Nos. 120-5 & 120-6 (qualifications cards).  Plaintiff also had an expired certification issued on December 24, 2015, which qualified Plaintiff to use and carry four firearms.[4/]  Defs.' CSF ¶ 16; see also Ex. G to Defs.' CSF.

Defendant Jelsma, who had arrived at the scene, instructed Plaintiff to drive himself to the police station to speak with Criminal Investigation Division ("CID") personal and allow them to take Plaintiff's statement.  See Pl.'s CSF ¶ 39; Ex. E to Defs.' CSF, ECF No. 110-6, ¶ 10.  Sometime after Plaintiff left the scene to drive to the police station, Defendant Jelsma received a call advising him of the earlier incident involving Plaintiff and Figueroa.  Id. ¶ 11.  When Defendant Jelsma arrived at the police station, he spoke with

---

[4/]  This includes a Smith & Wesson 906 9mm; a Smith & Wesson CS9 9mm; a Remington 870 12-gauge shotgun; and a Mossberg 500 12-gauge shotgun.  Defs.' CSF ¶ 16.

the responding officer who advised that Plaintiff had threatened
to shoot and kill Figueroa during that prior incident.  Id.

III.     **Plaintiff's Arrest**

Shortly after Plaintiff had returned to the police
station around 11:00 a.m., Plaintiff was told that the CID had
taken over the investigation of Plaintiff.  Pl.'s CSF ¶ 43.  A
few hours later, around 3:05 p.m., Plaintiff was arrested and
charged with six firearms violations, as well as three counts of
terroristic threatening related to the initial confrontation
with Figueroa.  Defs.' CSF ¶ 19; Pl.'s CSF ¶¶ 49-51; see also
Ex. B to Defs.' CSF at 65:1-4; Ex. E to Defs.' CSF § 12.

Plaintiff was ultimately indicted on February 21,
2019, for charges based on firearms violations and terroristic
threatening in connection with the incident involving Figueroa.
Pl.'s CSF ¶ 61.

IV.      **Subsequent Media Statements**

After Plaintiff's arrest, the County Defendants issued
two media releases about Plaintiff's arrest and charges.  Ex. L
to Defs.' CSF, ECF No. 110-13.  The first, issued on same day as
the incident, read in relevant part as follows:

> HPD Investigating 'Shots Fired' Report in
> Puna
>
> Hawai`i Island police are investigating a
> firearms incident initially reported as
> "gunshots fired" in the Hawaiian Paradise
> Park subdivision in lower Puna.  Responding

> officers contacted a group of individuals
> near the area where the shots were reported,
> although the preliminary investigation has
> thus far indicated that no shots were fired.
> Detectives assigned to the Criminal
> Investigations Section are continuing the
> investigation.

Ex. L to Defs.' CSF.  The second, which the Defendants issued

the next day, stated the following:

> <u>Hakalau Man Arrested for Firearms,</u>
> <u>Terroristic Threatening</u>
>
> East Hawai`i detectives arrested a 50-year-
> old Hakalau man late Thursday afternoon,
> Jan. 26, as part of their investigation into
> a firearms incident earlier in the day in
> Puna.
>
> John Rodrigues Jr. was arrested on suspicion
> of three counts of first-degree terroristic
> threatening and six firearms violations.
> After conferring with prosecutors, police
> released Rodrigues pending further
> investigation.
>
> The incident was initially reported as
> "gunshots fired" in the Hawaiian Paradise
> Park subdivision in lower Puna at
> approximately 10 a.m.  Responding officers
> contacted a group of individuals near where
> the shots were reported and were able to
> determine that no shots had been fired,
> although firearms were involved in a
> confrontation.
>
> Detectives assigned to the Criminal
> Investigations Section are continuing the
> investigation[.]

Ex. L to Defs.' CSF.

V.        **HCPD Policy**

HCPD has an explicit policy that requires its officers to "strictly observe all laws, policies and procedures prescribed by the . . . United States Constitution, Hawai`i Revised Statutes and judicial rulings."  Defs.' CSF ¶ 20.

With respect to LEOSA, the evidence does not show any HCPD training policy specifically concerning the statute or its application by state law enforcement officers.  Pl.'s CSF ¶ 62. However, the Department of the Attorney General (the "AG") and the County have a memorandum of understanding ("MOU") concerning LEOSA, the purpose of which is to "clarify and agree to the role of the AG regarding implementing the statewide standards for the federal Law Enforcement Officers Safety Act as codified at 18 U.S.C. § 926C (LEOSA), pertaining only to the section which allows retired law enforcement officers to carry a concealed firearm provided certain qualifications are met."  Ex. 12 to Pl.'s CSF, ECF No. 120-20.  The MOU gives the AG the statutory authority to regulate firearms in Hawai`i and provides that the firearm certification program under LEOSA is under the final authority of the AG.  Id.

## PROCEDURAL BACKGROUND

One year after the January 26, 2017 events took place, Plaintiff filed an eight-count complaint in state court against the County Defendants and against Doe Persons 1–10, Doe

Corporations 1–10, Roe "Non-Profit" Corporations 1–10, and Roe Governmental Entities 1–10. ECF No. 1-2. The County Defendants removed the case, ECF No. 1, to federal court shortly thereafter and then moved to dismiss, ECF No. 5, which the Court granted, ECF No. 14. After Plaintiff filed the First Amended Complaint, ECF No. 16, the County Defendants again moved to dismiss, ECF No. 17, and the Court again dismissed all of Plaintiff's claims without prejudice, ECF No. 27. Plaintiff filed the Second Amended Complaint on December 19, 2018. ECF No. 29.

The parties later sought to stipulate to dismiss two counts from the Second Amended Complaint, which the Court disallowed pursuant to the Federal Rules of Civil Procedure. See ECF No. 60. Following several months of discovery and attempts by Plaintiff to stay the case pending disposition of parallel criminal proceedings against him, Plaintiff filed the now-operative Third Amended Complaint. ECF No. 95. The Third Amended Complaint alleges seven counts: (I) violation of 42 U.S.C. § 1983 ("§ 1983") by Captain Jelsma; (II) violation of § 1983 by the County; (III) false arrest/false imprisonment; (IV) defamation per se; (V) defamation per quod; (VI) false light; and (VII) negligent investigation.

Now before the Court is the County Defendants' Motion for Summary Judgment, ECF No. 109, filed on October 22, 2019. Plaintiff filed his Opposition on November 26 and the County

11

Defendants filed a Reply on December 2.  The Court held a hearing on the Motion on Tuesday, December 17, 2019.

**STANDARD**

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Federal Rule of Civil Procedure ("Rule") 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Broussard v. Univ. of Cal., 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex, 477 U.S. at 323); see also Jespersen v. Harrah's Operating Co., 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a

12

genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. Matsushita Elec. Indus. Co., 475 U.S. at 587; see also Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (internal citation and quotation omitted)).

## DISCUSSION

The Court finds that the County Defendants are entitled to summary judgment on all seven counts of the Third Amended Complaint. The undisputed facts show that the HCPD officers had probable cause to arrest Plaintiff in accordance

with the events that took place on January 26, 2017. For that reason, Counts I, II, III, and VII must be dismissed. So too with Counts IV, V, and VI: Plaintiff's defamation and false light claims cannot survive summary judgment because truth is a complete defense to a defamation claim and Plaintiff has presented no dispute of fact as to the truth of the media releases.

For these reasons and those discussed in greater detail below, the County Defendants are entitled to summary judgment and the Third Amended Complaint is hereby dismissed against them.

## I.    Count I: § 1983 Against Defendant Jelsma

The undisputed facts show that Plaintiff's § 1983 claim against Defendant Jelsma fails for the same overarching reason that compelled this Court to dismiss the earlier complaints: The County Defendants had probable cause to detain and arrest Plaintiff.

"Section 1983 provides a cause of action against state actors who violate an individual's rights under federal law." Filarsky v. Delia, 566 U.S. 377, 380 (2012) (citing 42 U.S.C. § 1983). The County Defendants' argument for summary judgment on Count I is two-fold. They argue first that "the undisputed facts show that Plaintiff was not deprived of any rights," and

second that, regardless, qualified immunity protects Defendant
Jelsma from liability.  Mot. 7.  The Court agrees.

### a. Deprivation of Rights Under § 1983

Like in his prior complaints, Plaintiff's § 1983 claim
in the Third Amended Complaint alleges that Defendant Jelsma
deprived Plaintiff of two distinct rights:  (1) his Fourth
Amendment right to be free from arrest without a warrant or
probable cause, and (2) his federal right under LEOSA as a
"qualified retired law enforcement officer" to carry a concealed
weapon.  As discussed below, Plaintiff has not presented any
dispute of fact to establish that he was deprived of either of
these rights.

### i. Fourth Amendment

Plaintiff first claims that Defendant Jelsma's conduct
violated Plaintiff's Fourth Amendment rights.  The central
questions, then, are (1) whether Defendant Jelsma had probable
cause to arrest Plaintiff, and (2) if he did not, whether a
reasonable officer in Defendant Jelsma's position would have
believed that he had probable cause in light of clearly-
established law and the information he possessed.  See Hunter v.
Bryant, 502 U.S. 224, 227 (1991).  Both of these questions must
be answered in the affirmative.

The Fourth Amendment confers the right to protection
from arrest without probable cause.  Beck v. Ohio, 379 U.S. 89,

91 (1964).  Thus, "a claim for unlawful arrest is cognizable
under § 1983 as a violation of the Fourth Amendment, provided
the arrest was without probable cause or other justification."
Dubner v. City and Cty. of San Francisco, 266 F.3d 959, 964 (9th
Cir. 2001).  Courts have explained that "[p]robable cause to
arrest or detain is an absolute defense to any claim under §
1983 against police officers for wrongful arrest . . . as the
lack of probable cause is a necessary element" of the claim.
Lacy v. Cty. of Maricopa, 631 F. Supp. 2d 1183, 1193 (D. Ariz.
2008); see also Hart v. Parks, 450 F.3d 1059, 1069 (9th Cir.
2006) ("Because police had probable cause to arrest him, Hart's
false arrest claim necessarily fails.").

        Probable cause to arrest exists "when officers have
knowledge or reasonably trustworthy information sufficient to
lead a person of reasonable caution to believe that an offense
has been or is being committed by the person being arrested."
Fayer v. Vaughn, 649 F .3d 1061, 1064 (9th Cir. 2011) (quoting
United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007));
Michino v. Lewis, No. CIV. 13-00546 ACK, 2015 WL 3752503, at *5
(D. Haw. June 16, 2015) ("A warrantless arrest is lawful under
the Fourth Amendment . . . if it is accompanied by probable
cause to believe that the arrestee has committed, or is
committing, an offense." (citation and internal quotation marks
omitted)); see also Haw. Rev. Stat. ("HRS") § 803-5 (codifying

the probable cause standard).

The U.S. Supreme Court has indicated that probable cause can rest on an objectively reasonable but mistaken understanding of the law.  While the explicit holding of Heien v. North Carolina, 135 S. Ct. 530 (2014), is that "reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition," id. at 536, the Supreme Court's reasoning has similar implications in the probable-cause context.[5/]

Here, the County Defendants argue that Defendant Jelsma and the other officers had probable cause to arrest Plaintiff for either of two categories of crimes:  (1) firearms violations and (2) terroristic threating or harassment of Nathan Figueroa.  See Mot. 8-12.  Because Plaintiff was only arrested once, the County Defendants need only show that Defendant Jelsma had probable cause to arrest Plaintiff for one of these crimes. See Barry v. Fowler, 902 F.2d 770, 773 n.5 (9th Cir. 1990) (noting that an arrest is constitutional if officers had probable cause to arrest a plaintiff for one charge, even if probable cause did not exist for other charges).

### 1. Firearms violations

The undisputed facts make clear that Plaintiff gave officers consent to search his vehicle and that, during that

---

[5/]  For a more detailed discussion of the Supreme Court's holding in Heien, see the Court's November 20, 2018 Order at 18-20.

search, the officers recovered two firearms:  a Remington 870

shotgun and a Smith & Weston 5906 9mm handgun.  The Court has

explained in two prior orders that Plaintiff's possession of

these firearms appeared to the officers to violate HRS § 134-23

or HRS § 134-25.[6/]  See November 20, 2018 Order at 21-22; April

20, 2018 Order at 11-13.  The undisputed facts fleshed out

through discovery support the same conclusion now.  At the

least, Defendant Jelsma and the other officers did not have

information to suggest that the firearms in Plaintiff's vehicle

were lawful.  The facts show that when officers performed a

vehicle search with Plaintiff's consent and recovered the two

firearms, it appeared to them that Plaintiff had committed

felony violations of Hawai`i law.[7/]

Plaintiff's only real argument for why Defendant

Jelsma lacked probable cause to arrest Plaintiff on the state-

---

[6/]  These "places to keep" laws limit the lawful locations of possession
and provide for specified permissible destinations when traveling with
firearms.  They also define the required "enclosed container" for traveling
with firearms as "a rigidly constructed receptacle, or a commercially
manufactured gun case, or the equivalent thereof that completely encloses the
firearm."  Id.  HRS § 134-23 and HRS § 134-24 are virtually identical in
governing firearms other than pistols and revolvers, except that the former
applies to loaded firearms and the latter to unloaded firearms.  HRS § 134-25
governs the places to keep a pistol or a revolver.

[7/]  In fact, the undisputed facts suggest that Plaintiff was in
violation of Hawai`i law because the firearms were recovered from his
vehicle, not "confined to [his] place of business, residence, or sojourn,"
and he was not transporting the firearms to or from any of those enumerated
locations.  HRS § 134-23(a); see also HRS § 134-25(a).  Plaintiff also admits
to facts that show that that at least one of the firearms was stored in a
leather holster or soft case, not "a rigidly constructed receptacle" or some
case that "completely encloses the firearm."  HRS § 134-23(a); see also HRS §
134-25(a).

law firearms charges (aside from LEOSA, which is discussed infra) is that the January 26 incident occurred on a privately-owned road rather than a public highway.[8/]  See Opp. 15.  While Plaintiff asserts that the firearms charges were "predicated on the transport of the firearms on a 'public highway,'" he fails to explain how the public-private distinction is dispositive when Plaintiff was arrested on other firearms charges (the "places to keep" laws) that make no such distinction.  Opp. 15 (citing HRS §§ 134-23 through 134-26).  Only HRS § 134-26 governs "[c]arrying or possessing a loaded firearm on a public highway."  The Court does not see how the location of the January 26 incident—whether on private or public roads—is relevant to Plaintiff's arrest on other violations under HRS § 134-23 and § 134-25 (neither of which specify whether the offense must occur on private versus public roads).[9/]

Just as he unsuccessfully argued in opposition to the prior motions to dismiss, Plaintiff also argues that Defendant

---

[8/]  Plaintiff also states in conclusory terms and without any evidence or facts in support that "Plaintiff's shotgun was placed in a closed case, which enclosed the shotgun and was zippered closed around it."  Opp. 16. This does not account for the other violations—particularly, the non-complying location and storage of the firearms—that provided a basis for probable cause.

[9/]  Plaintiff's counsel pushed this point at the hearing as well.  As the Court stated then—and as Plaintiff admits—Plaintiff was arrested on multiple firearms statutes, at least two of which do not specify whether the violations must occur on a public roadway.  Even assuming the officers lacked probable cause on the § 134-26 charge, that would not negate probable cause on the other firearms violations under § 134-23 and § 134-25.  Additionally, Plaintiff's own CSF indicates that he necessarily drove over public highways with the subject firearms in his vehicle before he arrived at the scene.

Jelsma lacked probable cause to arrest him on any firearms violations because Plaintiff was lawfully in possession of firearms pursuant to LEOSA. LEOSA provides that a qualified retired law enforcement officer "carrying the identification required by subsection (d) may carry a concealed firearm . . . ." 18 U.S.C. § 926C(a). Plaintiff's argument that LEOSA applies to abolish probable cause fails once again. The County Defendants cite three shortcomings in Plaintiff's argument: (1) Plaintiff was not "carrying" a firearm within the confines of LEOSA because it was in his truck, not on his person or in his clothing; (2) LEOSA only authorizes qualified law enforcement officers to carry a single firearm, and two were recovered from Plaintiff's car; and (3) Plaintiff lacked the requisite identification under LEOSA to lawfully carry a firearm. The Court agrees with the County Defendants as to the latter two points.

Beginning with the County Defendant's first point, the Court disagrees that the guns being found in the cab and on the floor of Plaintiff's truck rather than on his person precludes LEOSA from applying. The County Defendants cite United States Supreme Court case District of Columbia v. Heller, 554 U.S. 570, 584 (2008), to support a narrow reading of the term, "carry." See Mot. 13. Of course, Heller analyzed the constitutional right to "bear arms" and considered the general meaning of "to

carry" in that context.  The majority in the 1998 case <u>Heller</u>
cites—<u>Muscarello v. United States</u>, 524 U.S. 125 (1998),
<u>superseded by statute as stated in</u> <u>United States v. Louisiana</u>,
196 F. Supp. 3d 612 (M.D. La. 2016)—contains a more on-point
discussion of the meaning of "carry."  There, the Supreme Court
held that to "carry arms or weapons" is not limited to only mean
those circumstances of bearing or carrying weapons upon the
person or clothing.  <u>Id.</u> at 130.  Rather, the Court recognized
the term as extending to the carrying of weapons in a car as
well.  <u>See</u> <u>id.</u> at 131 ("Given the ordinary meaning of the word
'carry,' it is not surprising to find that the Federal Courts of
Appeals have unanimously concluded that 'carry' is not limited
to the carrying of weapons directly on the person but can
include their carriage in a car.").  Thus, Plaintiff is not
precluded from relying on LEOSA merely because the guns were
found in his car rather than on his person.

Turning to the County Defendants second point, the
Court agrees—and has already held in a prior order—that it is
reasonable to interpret LEOSA to authorize qualified officers to
carry only "a firearm"—not multiple firearms.  The Court's
November 20, 2018 Order contains a thorough analysis of LEOSA
and this point.  The Court will not rehash it here other than to
clarify the extent of the holding.  In that regard, while the
Court previously declined to make a definitive ruling, it held

that—at a minimum—Defendant Jelsma was objectively reasonable in interpreting LEOSA to entitle a qualified law enforcement officer to carry only a single weapon, not the two found in Plaintiff's vehicle.  November 20, 2018 Order at 30-32.

Plaintiff once again argues that "LEOSA's plain and ordinary meaning permits and anticipates possession of multiple firearms."  Opp. 6; see also id. at 6-8.  And, once again, the Court finds Plaintiff's proposed interpretation to be "strained and unconvincing."  See November 20, 2018 Order at 30.  It would defy the plain meaning of the statute to hold that "a concealed firearm" means multiple firearms.[10/]  See id.  Regardless, what matters is that it would be objectively reasonable for an officer to interpret LEOSA to entitle a qualified individual to carry only one concealed weapon.  See November 20, 2018 Order at 18-20 (explaining that probable cause may be based on an officer's reasonable mistake of law).  Here, the undisputed facts show that Defendant Jelsma would have been entirely reasonable in thinking that LEOSA did not authorize Plaintiff to carry both of the two firearms recovered in the car.

---

[10/]  Plaintiff himself seems to admit that LEOSA allows him to carry only one firearm.  In his testimony in his HCPD proceedings, he stated, "I know in the . . . Law Enforcement Officer Safety Act . . . I am able to carry one firearm . . . .  I only need one permit for carry [sic] one gun."  Ex. C to Defs.' CSF at 2 (some alterations added).  The Court also notes that law enforcement appears to interpret the language to mean one, single firearm.  The MOU between the AG and the County, describes LEOSA as allowing "retired law enforcement officers to carry a concealed firearm provided certain qualifications are met."  Ex. 12 to Pl.'s CSF (emphasis added).

Finally, as to the County Defendant's third argument on LEOSA, the undisputed facts establish that Plaintiff failed to comply with LEOSA's identification requirements. For one, it appears that Plaintiff did not possess the necessary identification at all because his firearms qualification certifications for both firearms were not within the specified time requirements under LEOSA. Even if he had, Plaintiff has not provided factual evidence showing that he was carrying and that he presented the complete identification on the date of the arrest.

First, regarding the timeliness of the LEOSA documents, Plaintiff did not possess the requisite identification for both firearms at the time of the arrest. Subsection (d)(2) of LEOSA § 926C sets forth the relevant forms of identification required to lawfully carry a concealed firearm. Relevant here, Plaintiff was required to possess two items: (1) the specified photographic identification issued by HCPD and (2) a certification that Plaintiff "has, not less than 1 year before the date [Plaintiff] is carrying the concealed firearm," met certain firearms qualification standards.[11/] 18 U.S.C. § 926C(d)(2). It is undisputed that Plaintiff possessed

---

[11/] Section 926C(d)(1) also provides for another method of identification, in the form of a single document. It is undisputed that Plaintiff did not posses the single identification that would have satisfied 18 U.S.C. § 926C(d)(1), see Opp. 4-5 & Reply 4, so the Court focuses its analysis only on § 926C(d)(2).

the ID Card, satisfying the first requirement.  See Ex. 2 to
Pl.'s CSF; Ex. F to Defs.' CSF; see also Opp. 5.  But the
undisputed facts show that Plaintiff did not possess the second
requirement for each of the two firearms recovered:  a
certification of firearms qualification dated "not less than one
year before" January 26, 2017.

    The record shows two firearm certifications issued to
Plaintiff.  The first was issued on December 24, 2015, and
qualified Plaintiff to use four specified firearms, including a
S&W 5906 9mm semiautomatic pistol.  See Ex. G to Defs.' CSF; Ex.
3 to Pl.'s CSF, ECF No. 120-4.  The second was issued on
February 19, 2016, and qualified Plaintiff to use a Remington
870 12-guage pump shotgun, with the serial number RS01242Y.  See
Ex. H to Defs.' CSF, ECF No. 110-9; Ex. 4 to Pl.'s CSF.  The
first certification was issued more than one year before the
relevant date of carry (January 26, 2017), while the second was
issued within one year of that date.  As stated above, §
926C(d)(2)(B) requires that Plaintiff be carrying a certificate
dated within one year of the date of carry.  The December 2015
certification for the 9mm shotgun was issued more than one year
before January 26, 2017, and was therefore expired at the time
of the incident and untimely under LEOSA. See Reply 4.

    In any event, even if Plaintiff had the LEOSA-
compliant documentation, Plaintiff has not raised a genuine

issue of fact to establish that he was "carrying the

identification required by subsection (d)" on the date of the

arrest.  18 U.S.C. § 926C(a).  While Plaintiff arguably has

raised a dispute of fact as to whether he was carrying the ID

Card,[12/] he has not established that he was carrying any

certificate of firearms qualification, let alone one that met

the strictures of § 926C(d)(2)(B).[13/]  <u>See</u> Opp. 5 (arguing that

_____

[12/]  Conflicting testimony and declarations raise a dispute of fact as to
whether Plaintiff presented his ID Card and whether Defendant Jelsma looked
at it.  <u>Compare</u> Ex. B to Defs.' CSF at 45 (Plaintiff's deposition testimony
stating that he showed the ID Card to Defendant Jelsma and the arresting
officer, Detective Kelii), <u>and</u> Ex. E to Defs.' CSF ¶ 13 (Defendant Jelsma's
declaration that he was not presented the LEOSA card).  As discussed in the
November 20, 2018 Order, if Defendant Jelsma refused to look at the card,
then he could not know that Plaintiff did not meet LEOSA's identification
requirements and could not avail himself of its protection.  <u>See</u> November 20,
2018 Order at 26-27.  Even though the ID Card alone would not have satisfied
the strictures of LEOSA, for all Defendant Jelsma knew, it might have.  <u>See
id.</u>  While an officer may not ignore exculpatory evidence that would negate
probable cause, <u>Yousefian v. City of Glendale</u>, 779 F.3d 1010, 1014 (9th Cir.
2015), the facts in Defendant Jelsma's knowledge would have suggested to him
that LEOSA may not have been exculpatory anyway because Plaintiff had two
weapons in his vehicle, not just a single firearm.  As explained above, even
if Defendant Jelsma was mistaken about LEOSA authorizing the carrying of only
one firearm, that mistake was an objectively and eminently reasonable one.

[13/]  The Court notes that Plaintiff did—likely in response to the Court's
prior orders—amend the earlier complaints to allege that "Plaintiff was
carrying on his person, a Hawaii Police Department Firearms Qualification
Card" and that he "attempted to show and give the Firearms Qualification Card
. . . to Defendant Jelsma but Jelsma refused to look at that as well."  3AC
¶¶ 123-24.  He also suggests in his CSF (though not his Opposition) that he
showed the qualifications card as well.  Pl.'s CSF ¶ 15.  Despite these
assertions, Plaintiff has offered no factual evidence in support.  In fact,
he testified in his deposition that he only presented the ID Card and nothing
else.  Plaintiff cannot baldly assert now that he showed the qualifications
card when his previous deposition testimony and other independent evidence
shows just the opposite.  <u>See</u> <u>Yeager v. Bowlin</u>, 693 F.3d 1076, 1080 (9th Cir.
2012) ("The general rule in the Ninth Circuit is that a party cannot create
an issue of fact by an affidavit contradicting his prior deposition
testimony." (quoting <u>Van Asdale v. Int'l Game Tech.</u>, 577 F.3d 989, 998 (9th
Cir. 2009)));  <u>see also</u> <u>Anderson</u>, 477 U.S. at 247-48 (stating that a party
cannot "rest upon the mere allegations or denials of his pleading" in
opposing summary judgment).  Moreover, even to the extent that this fact is
in dispute, Defendant Jelsma was reasonable in believing that LEOSA did not
apply for the other reasons stated in this Order.

"Plaintiff <u>possessed</u> a certification" but not stating he was carrying such certification); Ex. B to Defs.' CSF at 45-46 (Plaintiff's testimony that he only showed his LEOSA ID Card and that he didn't "have anything else to show"); <u>id.</u> at 56-57 (Plaintiff's testimony regarding his lack of memory as to whether he presented a qualifications card on January 26). Thus, Plaintiff has not established that he was carrying <u>any</u> certificate of firearms qualification, let alone one that met the strictures of § 926C(d)(2)(B).

Because any mistake of law Defendant Jelsma made in determining that LEOSA did not apply was objectively reasonable, his arrest of Plaintiff for firearms violations was supported by probable cause. See <u>Heien</u>, 135 S. Ct. at 536, 539; <u>United States v. Diaz</u>, 854 F.3d 197, 202-03 (2d Cir. 2017); <u>Olsen v. City of Henderson</u>, 648 F. App'x 628, 631 (9th Cir. 2016) (unpublished). Defendant Jelsma therefore did not violate Plaintiff's Fourth Amendment right to be free from arrest unsupported by a warrant or probable cause.

### 2. Terroristic Threatening or Harassment

In addition to the firearms violations, Defendant Jelsma had probable cause to arrest Plaintiff for terroristic threatening of Figueroa, or other lesser harassment charges.[14]

---

[14] Plaintiff's Opposition addresses the lack of probable cause to arrest him for terroristic threatening "against Brooks and Lopez," in the

Terroristic threatening occurs when a person "threatens, by word or conduct, to cause bodily injury to another person . . . [w]ith the intent to terrorize, or in reckless disregard of the risk of terrorizing . . . ."  HRS § 707-715; see also id. § 707-716.

The encounter with Figueroa apparently took place before Plaintiff encountered Brooks, but Plaintiff left the scene and it was not until later that morning that Figueroa reported the incident to HCPD.  Defendant Jelsma and the other officers were instead informed of the earlier incident involving Figueroa when Plaintiff was already present at the police station in connection with the later encounter with Brooks.

There is very little coherent factual detail related to the incident involving Figueroa.  Plaintiff has refused to answer almost all discovery and deposition questions related to the incident with Figueroa by invoking his Fifth Amendment right against self-incrimination, evidently because of the pending

---

later encounter that caused Plaintiff to call 9-1-1.  See Opp. 16.  Yet the County Defendants do not appear to argue in their Motion that probable cause is grounded in a charge of terroristic threatening against Brooks and Lopez. They only argue that the officers had probable cause to arrest Plaintiff for state-law violations in connection with the threats made against Figueroa that occurred earlier on the same morning. See Mot. 10-12; Reply 9-10.  And, in fact, Plaintiff admits in his Opposition that he was only arrested for terroristic threatening of Figueroa, not for threatening Brooks or Lopez. Opp. 18.  At the hearing, Plaintiff seemed to reverse course, pointing to Detective Almeida's police report, which lists nine "Connect-up reports." Ex. 6 to Pl.'s CSF at p. 15 of 22.  It is ultimately not clear whether Plaintiff was simply investigated in connection with the Brooks/Lopez encounter or whether he was indeed arrested in connection with that encounter as well.  See id.

criminal trial.  On that basis, the County Defendants now seek
an adverse inference against Plaintiff that the events
concerning Figueroa did in fact occur.  See Mot. 3 n.1.  They
argue that an adverse inference can be drawn from Plaintiff's
invocation of his Fifth Amendment right and that independent
evidence—Plaintiff's prior testimony about the incident in
proceedings before the Hawai`i Police Commission—further
supports such an inference.  See id. (citing Baxter v.
Palmigiano, 425 U.S. 308, 318 (1976); Doe ex rel. Rudy-Glanzer
v. Glanzer, 232 F.3d 1258, 1264 (9th Cir. 2000)); see also Ex. C
to Defs.' CSF (Plaintiff's prior testimony to HCPD).

        In their Motion, the County Defendants also seek to
prevent Plaintiff from relying on his own evidence to "support
[his] version of a disputed issue where [he] ha[s] asserted
[his] Fifth Amendment right not to answer questions concerning
that very same issue."  Id. (quoting Pedina v. Chun, 906 F.
Supp. 1377, 1398 (D. Haw. 1995)).  Plaintiff does not offer any
meaningful contradictory evidence anyway.  His only argument is
that his "arrest in the Figueroa case had nothing to do with the
false arrest in the Brooks/Lopez and firearms cases" and that
"[t]he Figueroa case is not relevant to the present case."  Opp.
17.  Plaintiff argues that evidence regarding the Figueroa
encounter is therefore irrelevant and inadmissible.  Plaintiff
also points to the fact that the Hawaii County Prosecutor's

office originally declined to prosecute Plaintiff because it apparently considered any threat to Figueroa to be "conditional" and therefore "not a chargeable offense."  Opp. 17-18.

On the one hand, the Figueroa encounter does appear to have occurred separately from the Brooks encounter; it happened earlier in the day and at a different location.  On the other hand, Plaintiff admits that he was arrested on January 26 "based on the offenses associated with the Figueroa case."  Opp. 18. And factual evidence submitted by Plaintiff confirms that one overlapping investigation was conducted in connection with the Figueroa encounter and the Brooks/Lopez encounter.  See Ex. 6 to Pl.'s CSF at 40-41.

While the exact progression of events is hard to glean from the varying police reports and inconsistent statements by Plaintiff, Plaintiff cannot dispute—and in fact has admitted— that his January 26 arrest was based, at least in part, on the alleged threats against Figueroa.  While Plaintiff may have originally presented to the police station in connection with the Brooks encounter, it is undisputed that he was ultimately arrested only one time.  So even if there were two separate incidents here, there was only one arrest.  And an arrest is constitutional so long as officers had probable cause to arrest the subject on one charge, even if probable cause did not exist

for other charges.[15/] See Barry, 902 F.2d at 773 n.5.

Plaintiff himself admitted under oath that he may have harassed Figueroa, and it is clear from Plaintiff's own testimony that he made threatening statements toward Figueroa.[16/] Indeed, as stated earlier, Figueroa told Detective Kelii that he initially felt threatened by Plaintiff but then concluded that Plaintiff was not mad actually at him. See Ex. 17 to Pl.'s CSF at p. 4 of 10. Moreover, the State apparently thought it at least had enough evidence to eventually indict and charge Plaintiff with, inter alia, terroristic threatening of Figueroa.

Despite Plaintiff's statements to the contrary, the facts uncovered in this litigation show that the Figueroa incident and the later Brooks incident are at least somewhat related. The incidents both apparently involve a father

---

[15/] At the hearing, Plaintiff's counsel focused almost exclusively on why probable cause did not exist in connection with the Brooks incident specifically. He pointed out the nine charges on which Plaintiff was apparently arrested included terroristic threatening of Brooks and Lopez (although it appears those were just investigations, not necessarily the charges underlying the ultimate arrest). See Ex. 6 to Pl.'s CSF. Plaintiff's counsel erroneously focused his challenge on only some of those nine charges even though an arrest is constitutional so long as there is probable cause on at least one of the charges forming the basis for the arrest.

[16/] Plaintiff filed a complaint with the HCPD before he filed this lawsuit. In those proceedings, Plaintiff testified about his encounter with Figueroa: "So I take my guns with me. These guys going carry guns, I going bring my guns. I find the first boy he's in the bug he's like ho I like talk to you. He comes out and says . . . you know what . . . the next time I [inaudible] for you . . . the next time your friend fuck my boy . . . I going put one bullet in your fucken head first . . . then I going find him. Okay. He's all scared. I would be scared too. . . . " Ex. C. to Defs.' CSF at 2. He also testified, "But I say the word that I use out of my mouth was the next time you fuck with my son, I will put a bullet in your head. So he hasn't fucked with my son. The threat is not viable. The most you have is a harassment. That is not a threat. . . . " Id. at 4.

(Plaintiff) taking some imprudent actions in seeking to protect his son from alleged threats made by Brooks.  While the incidents occurred separately, Plaintiff's earlier confrontation with Figueroa—who also had worked with Plaintiff's son and Brooks—appears to have been a means to the same end:  locating and confronting Brooks.

Finally, Plaintiff's arguments that the Federal Rules of Evidence forbid the officers from considering other criminal acts in determining the circumstances to support probable cause, see Opp. 17-18, are meritless.  "Police may rely on hearsay and other evidence that would not be admissible in court to determine probable cause."  Hart, 450 F.3d at 1066.

The undisputed facts and the information and evidence available to Defendant Jelsma and the arresting officers on the date of the incident compel the Court to hold that the officers met the minimal standard for probable cause.  Accordingly, the firearms charges and the terroristic threatening charges each independently provided the officers with probable cause, meaning Plaintiff has failed to identify a factual dispute that he was deprived of his right under the Fourth Amendment.

### ii. LEOSA

In addition to his Fourth Amendment claim, Plaintiff argues that his arrest violated his federal right to carry concealed weapons under LEOSA.  In his Opposition, Plaintiff

makes the same legal arguments he previously made in response to the motion to dismiss the earlier complaint, arguments that were expressly rejected by this Court.  Plaintiff cites the D.C. Circuit case holding that LEOSA creates, for qualified individuals, a federal right to carry concealed weapons that may be vindicated under § 1983.  Opp. 5-6 (citing Duberry v. District of Columbia, 824 F.3d 1046 (D.C. Cir. 2016)). Plaintiff has not established, however, that he had such a right on January 26, 2017, because, as discussed supra, (1) he was carrying more than one firearm on the date of arrest, (2) he was not carrying any qualifications card on the date of his arrest and, (3) he did not have the timely qualifications under LEOSA.

In any event, as the Court pondered in the November 20, 2018 Order, it is unlikely that any right created by LEOSA was "clearly established" on January 26, 2017, as would be necessary for Plaintiff to maintain this claim against Defendant Jelsma.  See November 20, 2018 Order (collecting qualified immunity cases).  Regardless, because LEOSA's protection did not apply to Plaintiff during the at-issue events, his arrest cannot have violated any rights secured to him by LEOSA.

In sum, the undisputed facts show that Defendant Jelsma did not violate Plaintiff's constitutional or statutory rights.  In the absence of such a violation, Plaintiff's § 1983 claim cannot stand.

### b. Qualified Immunity

Qualified immunity shields government officials who perform discretionary functions from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In deciding whether a government official is entitled to qualified immunity in a § 1983 action, courts determine (1) the federal constitutional or statutory right allegedly violated; (2) whether the right was clearly established[17]; and (3) whether a reasonable official would have believed the official's conduct to be lawful. Hamilton v. Endell, 981 F.2d 1062, 1066 (9th Cir. 1992) (citing Romero v. Kitsap Cty., 931 F.2d 624, 627 (9th Cir. 1991)).

Whether an official is protected by qualified immunity often turns on the "objective legal reasonableness" of his action. Anderson v. Creighton, 483 U.S. 635, 639 (1987). If the action at issue is an allegedly unlawful arrest, "the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2)

---

[17] To analyze whether a right was clearly established, courts attribute to defendants knowledge of constitutional developments at the time of the alleged violations, including all available case law. Fed. Deposit Ins. Corp. v. Henderson, 940 F.2d 465, 477 (9th Cir. 1991). Notably, at the hearing, Plaintiff's counsel declared that the LEOSA issues present an important "case of first impression."

whether it is reasonably arguable that there was probable cause
for arrest—that is, whether reasonable officers could disagree
as to the legality of the arrest such that the arresting officer
is entitled to qualified immunity." Rosenbaum v. Vashoe Cty.,
663 F.3d 1071, 1076 (9th Cir. 2011); see also Hunter, 502 U.S.
at 226-27 (qualified immunity will shield the arresting officers
if a reasonable police officer would have believed that probable
cause existed to arrest the plaintiff).

The Court has already held that Plaintiff's individual
rights were not violated and that Defendant Jelsma had probable
cause to arrest Plaintiff for any one of several firearms and
terroristic threatening violations.  Accordingly, Defendant
Jelsma would also be entitled to the shield of qualified
immunity.

## II.      Count II: § 1983 Against the County

Because the Court has held that Plaintiff was not
deprived of a federal constitutional or statutory right,
Plaintiff's § 1983 claim for municipal liability against the
County must be dismissed by extension.  See Quintanilla v. City
of Downey, 84 F.3d 353, 355 (9th Cir. 1996).

Even assuming that a deprivation of a right did occur,
municipal liability under § 1983 "can only be imposed for
injuries inflicted pursuant to an official government policy or
custom."  Davis v. City of Ellensburg, 869 F.2d 1230, 1233 (9th

Cir. 1989).  A "policy" is a "deliberate choice to follow a
course of action made from among various alternatives by the
official or officials responsible for establishing final policy
with respect to the subject matter in question."  Fogel v.
Collins, 531 F.3d 824, 834 (9th Cir. 2008) (quoting Fairley v.
Luman, 281 F.3d 913, 918 (9th Cir. 2002) (per curium)).  "A
'custom' for purposes of municipal liability is a 'widespread
practice that, although not authorized by written law or express
municipal policy, is so permanent and well-settled as to
constitute a custom or usage with the force of law.'"  Young v.
City of Visalia, 687 F. Supp. 2d 1141, 1147 (E.D. Cal. 2009)
(quoting St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct.
915 (1988)).

        In addition to the fact that the HCPD officers had
probable cause to arrest Plaintiff, Plaintiff has not provided
any evidence showing that HCPD has a policy or custom allowing
unconstitutional arrests.  "Absent a formal governmental policy,
[Plaintiff] must show a 'longstanding practice or custom which
constitutes the standard operating procedure of the local
government entity.'"  Trevino v. Gates, 99 F.3d 911, 918 (9th
Cir. 1996).  The practice or custom "must be so persistent and
widespread that it constitutes a permanent and well settled city
policy."  Id.  Liability "may not be predicated on isolated or
sporadic incidents; it must be founded upon practices of

sufficient duration, frequency and consistency that the conduct

has become a traditional method of carrying out policy." Id.

Here, Plaintiff focuses the support for municipal

liability on LEOSA. See Opp. 21. He appears to be attempting

to satisfy his burden of showing a policy or custom by relying

on a "failure to train" theory. See id.; see also id. at 22

("Had the County distributed the AG's LEOSA policies and rules

and trained its officers, more scrutiny and discernment could

have been used so that the Plaintiff would not have been

arrested and prosecuted."). This theory fails.

To succeed under a failure-to-train theory in the §

1983 context, Plaintiff's evidence must address the following

three factors:

> First, it must be determined whether the
> existing training program is adequate. The
> adequacy of a particular training program must
> be resolved "in relation to the tasks the
> particular officers must perform." A training
> program will be deemed adequate if it "enables
> officers to respond properly to the usual and
> recurring situations with which they must
> deal."
>
> Second, if the training program is deemed
> inadequate, it may justifiably be said to
> constitute a city policy. Such will be the
> case, however, "only where the failure to
> train amounts to deliberate indifference to
> the rights of persons with whom the police
> come into contact." This heightened degree of
> culpability on the party [sic] of a
> municipality may be established when "the need
> for more or different training is so obvious,
> and the inadequacy so likely to result in the

36

> violation of constitutional rights, that the
> policymakers of the city can reasonably be
> said to have been deliberately indifferent to
> the need."
>
> Finally, inadequate training that manifests
> deliberate indifference on the part of a
> municipality must be shown to have "actually
> caused" the constitutional deprivation at
> issue.

Merrit v. Cty. Of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989)

(quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 391-92

(1989)).  A municipality's training program can be actionable

under § 1983 only if Plaintiff proves all three factors.  See

id.

Plaintiff argues that the County "does not have any

policies or training concerning LEOSA."  Opp. 21-22.  Plaintiff

also argues that the County is estopped from arguing to the

contrary because it has refused to provide discovery on its

policies in this regard.  Id. at 22.  Yet Plaintiff has not

offered any factual evidence to support a failure to train

theory, and he has not demonstrated that any one at HCPD was on

notice of any alleged deficiencies in the training of police

officers with respect to LEOSA.  See Opp. 21.

Plaintiff's § 1983 municipal liability claims must

therefore fail.  Plaintiff has raised no genuine issue of

material fact that the County Defendants had actual or

constructive notice that the HCPD's officer training was

deficient.  See Connick v. Thompson, 131 U.S. 1350, 1360 (2011)

("A pattern of similar constitutional violations by untrained

employees is 'ordinarily necessary' to demonstrate deliberate

indifference for purposes of failure to train.").  "Only where a

failure to train reflects a deliberate or conscious choice by

the municipality . . . can a city be liable for such a failure

under § 1983."  Canton, 489 U.S. at 389.  Moreover, because the

Court has already held that Plaintiff has failed to prove a

constitutional deprivation of a right, Plaintiff cannot prove

that any lack of training by the County is "closely related to

the ultimate injury."  Lee v. City of Los Angeles, 250 F.3d 668,

681 (9th Cir. 2001) (requiring plaintiff to prove that the

"constitutional 'injury would have been avoided' had the

governmental entity properly trained its employees" (quoting

Oviatt By and Through Waugh v. Pearce, 954 F.2d 1470, 1474 (9th

Cir. 1992))).

        The Court therefore holds that Plaintiff's § 1983

claim against the County must fail.

**III.     Count III: False Arrest/False Imprisonment Against the County Defendants**

        Plaintiff's state-law false arrest/false imprisonment

claim[18] fails for the reasons explained in the April 20, 2018

_____

        [18] Because "a person who is falsely arrested is at the same time falsely
imprisoned, false arrest and false imprisonment as tort claims are
distinguishable only in terminology."  Reed, 76 Haw. at 230, 873 P.2d at 109.

and November 20, 2018 Orders.  See ECF Nos. 14 & 27.  A

determination that the arresting officer "had probable cause is

a defense to the common law claims of false arrest[] [and] false

imprisonment[.]"  Reed v. City & Cty. of Honolulu, 76 Haw. 219,

230, 873 P.2d 98, 109 (1994) (citing House v. Ane, 56 Haw. 383,

390-91, 538 P.2d 320, 325-26 (1975) and Towse v. State, 64 Haw.

624, 635, 647 P.2d 696, 704 (1982)); see also Freeland v. Cty.

of Maui, No. CIV. 11-00617 ACK-KS, 2013 WL 6528831, at *19 (D.

Haw. Dec. 11, 2013) ("Probable cause is an affirmative defense

to the claim of false imprisonment." (citation omitted)).

Defendant Jelsma made a warrantless arrest of Plaintiff after he

"saw and observed what reasonable persons would believe to be an

offense being committed in [his] presence."  House, 56 Haw. at

391, 538 P.2d at 326.  Accordingly, the undisputed facts show

that Plaintiff's detention and restraint were lawful, and the

County Defendants are entitled to summary judgment on the false

arrest/false imprisonment claim, Count III.

IV.      **Counts IV–VI: Defamation "Per Se," Defamation "Per
         Quod," and False Light Against the County Defendants**

         The County Defendants are also entitled to summary

judgment on Counts IV through VI, defamation and false light.

As the Court explained in the November 20, 2018 Order, the truth

of an allegedly defamatory statement is a complete defense to an

action for defamation.  See November 20, 2018 Order at (citing

Basilius v. Honolulu Pub. Co., 711 F. Supp. 548, 551 (D. Haw. 1989), aff'd sub nom. Polycarp Basilius v. Honolulu Pub. Co., 888 F.2d 1394 (9th Cir. 1989) and Kohn v. West Hawaii Today, Inc., 65 Haw. 584, 590, 656 P.2d 79, 83 (1982)).

The Third Amended Complaint focuses on the same two media releases quoted in the prior complaints, which twice this Court has found insufficient to support the defamation and false light claims. The only evidence Plaintiff submits are copies of the media releases and declarations from individuals in Plaintiff's community speaking to resulting damage to his reputation. See Opp. 23 (discussing these declarations); Ex. 15 to Pl.'s CSF, ECF No. 120-23 (declarations). And the Opposition makes the exact same arguments made previously, which this Court rejected.

The undisputed facts compel the Court to again dismiss the defamation and false light claims because Plaintiff has again failed to establish that the County Defendants made a false statement. As discussed in great detail in the November 20, 2018 Order, the absence of a false statement precludes Plaintiff's claims for defamation and false light. Accordingly, because truth is "a complete defense to an action for defamation," Basilius, 711 F. Supp. at 551, the County Defendants are entitled to summary judgment in their favor on Counts IV, V, and VI of the Third Amended Complaint.

**V.      Count VII: Negligent Investigation Against the County Defendants**

Finally, the County Defendants are entitled to summary judgment on Count VII, negligent investigation.  As the County Defendants rightly point out, "[t]here is no 'duty' to not arrest without probable cause."  Pourny v. Maui Police Dep't, Cty. of Maui, 127 F. Supp. 2d 1129, 1145-46 (D. Haw. 2000) (citing Reed, 76 Haw. 219, 230, 873 P.2d at 109).  There is only the intentional tort of "false arrest," which the Court addressed in connection with Count III.  See id.

Plaintiff argues in his Opposition that the negligent investigation claim is based on a duty created by HRS § 803-5, which Plaintiff cites as support for his statement that "Defendants have a legal duty to conduct a through [sic] investigation."  Opp. 24 (citing HRS § 803-5).  HRS § 803-5 says nothing about a duty to conduct any investigation, let alone a thorough one.  All it does is (1) allow an officer to arrest or detain a person without a warrant when there is probable cause and (2) state the standard for probable cause.

Hawai`i law does not provide for any legal duty not to arrest without probable cause and, even so, the Court has explained that the County Defendants had probable cause anyway.  Accordingly, the County Defendants are entitled to summary

judgment in their favor on Count VII of the Third Amended
Complaint.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants
County of Hawai`i and Samuel Jelsma's Motion for Summary
Judgment, ECF No. 109, and dismisses all of Plaintiff's
claims.[19]


IT IS SO ORDERED.

DATED: Honolulu, Hawai`i, December 30, 2019.

Alan C. Kay
Sr. United States District Judge

Rodrigues v. County of Hawaii, et al., Civ. No. 18-0027-ACK-WRP, Order
Granting Defendants County of Hawaii and Samuel Jelsma's Motion for
Summary Judgment.

---

[19] Despite this outcome, the Court notes that it remains troubled by
Defendant Jelsma's treatment of Plaintiff, which Plaintiff alleges was based
on a bad past relationship between the two. See Opp. 16-17, 19-20. With
that said, such treatment—without more—does not amount to a violation of
Plaintiff's Fourth Amendment rights. See Devenpeck v. Alford, 543 U.S. 146,
153-155 (2004) (rejecting interpretation of the Fourth Amendment that would
"depend upon the subjective state of mind of the officer"); see also Reply 8
n.3.